**René BOULÉ and Claude Boulé, Plaintiffs,**

v.

**Ingrid HUTTON, Leonard Hutton Galleries, Inc., Mark Khidekel and Regina Khidekel, Defendants.**

**No. 97 Civ. 144(MGC).**

United States District Court,
S.D. New York.

Oct. 12, 1999.

Rosenman & Colin LLP, New York City by Gerald A. Rosenberg, Stacey B. Creem, for Plaintiffs.

Pollet & Felleman, LLP, New York City by George P. Felleman, Elizabeth Koltun, for Defendants.

### *OPINION*

CEDARBAUM, District Judge.

This action arises from a dispute over the authenticity of certain paintings attributed to Lazar Khidekel, a Russian avant-garde artist who died in 1986. René and Claude Boulé are Parisian art collectors who own more than 150 Khidekel paintings. Claude is an art historian and René a retired dentist. The Boulés wish to sell a substantial number of the Khidekels in their collection. The defendants are Mark and Regina Khidekel, a son and daughter-in-law of the artist who are now permanent residents of New York, and the New York City art dealer and her gallery through which Mark and Regina are offering for sale the collection of Khidekel paintings that they inherited. The Boulés sue under the Lanham Act for promotion of the Khidekel paintings for sale at the Hutton Galleries by false disparagement of the authenticity of the Boulés' collection of Khidekel paintings. The complaint also asserts pendent state law claims including injury to business reputation, disparagement of goods and defamation.

Defendants have moved for summary judgment on plaintiffs' Lanham Act claim. They argue (1) that plaintiffs do not have standing to sue under the Lanham Act, because they are not commercial parties and because they are not engaged in United States commerce, and (2) that the statements sued upon either were not made "in commercial advertising or promotion" or were not "representations of fact" within the meaning of the Lanham Act. For the

reasons that follow, defendants' motion is granted in part and denied in part.

## BACKGROUND

### I. The Parties

Plaintiffs René and Claude Boulé are citizens and residents of France. Claude is an art historian and has published a book on Russian Constructivism, *Le Construvisme Russe: Typographies & Photomontages* (Flammarion 1991). (Pl.Ex. H.) Defendants Mark and Regina Khidekel are Russian citizens who have resided in New York since 1993. Defendant Ingrid Hutton is a United States citizen and a resident of New York. Hutton is a partner in defendant Leonard Hutton Galleries ("Hutton Galleries"), which is located in New York City. (Def.Ex. G.8.)

Hutton Galleries specializes in Russian avant-garde art and German expressionism, and also carries early 20th century paintings of French and Italian artists. (Def.Ex. G.9.) There are only a handful of galleries in Europe and the United States that specialize in the Russian avant-garde. (Pl.Ex. O (Moch Dep.) 10, 17; Pl.Ex. P (Flak Dep.) 17–18.) Edith Flak, who manages a gallery in Paris, testified that "in the United States [Ingrid Hutton's] gallery is considered to be a sort of flagship gallery" in Russian avant-garde art, and Yvette Moch, who formerly managed an art gallery in Paris, testified that Hutton Galleries is a "very important gallery" for the Russian avant-garde. (Pl.Ex. P (Flak Dep.) 17; Pl.Ex. O (Moch Dep.) 17.)

### II. Early Dealings between the Boulés and the Khidekels

From 1984 to 1986, René and Claude Boulé purchased 176 paintings attributed to Lazar Khidekel from a Russian art dealer whom the parties refer to as "Volodia."

(Def. Ex. D (Claude Dep.) 49, 55, 88.) "Volodia" did not disclose the provenance of the paintings he sold to the Boulés,[1] and the Boulés did not consult with any third parties to confirm the works' authenticity at the time of the purchases. (*Id.* 92–93.) In 1991, the Boulés purchased an oil painting attributed to Lazar Khidekel at a Sotheby's auction in London. (Pl.Ex. I (Claude Dep.) 108, 111.)

The Boulés had friendly relations with Mark and Regina Khidekel from 1988 to 1991. The Boulés have produced certificates purportedly signed by Mark in June 1991 authenticating certain Khidekels owned by the Boulés. (Compl. Ex. C; Pl.Ex. I (Claude Dep.) 222–25.) According to the Boulés' testimony, they paid Mark a fee of 40,000 francs for the 16 certificates of authenticity that he signed. (*Id.*; René Aff. ¶ 31.) Mark denies having signed the certificates. (Mark Dep. 155–57.) Certificates of authenticity facilitate sales of artwork to third parties. (Pl.Ex. P (Flak Dep.) 24–26.)

### III. Defendants' Statements

Plaintiffs' Lanham Act claim is bottomed on the following statements in approximate chronological order.

#### A. Statements to Individual Curators and Dealers

At an international art fair in Paris in October 1994, Yvette Moch, a retired art gallery manager who is still involved in the art world, approached Ingrid Hutton in order to show her the catalogue of the Tanlay exhibition for which Moch had been the curator. In particular, Moch wanted to show her a reproduction of a painting by Popova. (Moch Dep. 26–27.) According to Moch, Hutton saw a Khidekel while she was flipping through the catalogue and

---

1. According to René, "Until the collapse of the Soviet Union in 1991, it was a serious crime to offer to sell, trade or export from Russia works of art that had been created in Russia. Accordingly, those who managed to bring works out of Russia prior to 1991, such as Volodia, were extraordinarily guarded about (a) the ultimate provenance of the works they were offering for sale, (b) the identity of the person from whom they acquired the works, and (c) their own background . . . ." (René Aff. ¶ 8.)

said, "that is no good." (*Id.* at 27.) Moch understood Hutton to be referring to the authenticity of the work, which came from the Boulés' collection. (*Id.* at 28.) Moch never repeated Hutton's comment to anyone except the Boulés. (*Id.* at 32–33.)

Plaintiffs submit an affirmation of Slava Kogan, an art dealer who is a United States citizen residing in France, and who "[f]or many years [has] purchased works in the former Soviet Union and sold [them] in the West." (Kogan Aff. ¶ 3.) Kogan states that when he was in New York in late 1995 he "stopped by" the Hutton Galleries. (*Id.* ¶ 5.) At that time, he:

> "asked Mrs. Hutton what her opinion was of the collection of art that the Boulés attribute to Khidekel. Mrs. Hutton said to me, in unambiguous and emphatic terms, that the Boulés' collection of Khidekels consisted of fakes, i.e., works falsely attributed to the artist Lazar Khidekel. She added, 'don't touch them.' In response, I mentioned that the Boulés had certificates of authenticity signed by Mark Khidekel. Mrs. Hutton told me that they too were 'fakes.'"

(*Id.* ¶¶ 5, 6.)

Plaintiffs allege that Hutton made similar statements to Antoine Blanchette, who had curated a Canadian exhibition which had included Khidekels from the Boulés' collection. (Pl. 56.1 ¶ 71.) The evidence supporting this allegation is an article from a Canadian newspaper which quoted Hutton as saying, "I told [Blanchette] that I didn't think [his Khidekels, which he purchased from the Boulés,] were right. . . . Mine look different." However, the article also reported that Blanchette said that he "could not remember Hutton dismissing the Khidekels he presented as fakes." (Def.Ex. K.) In their Rule 56.1 Statement, plaintiffs also allege that Hutton made similar statements to Gilles Gheerbrant

and Patricia Railing, a British art scholar. (Pl. 56.1 ¶ 71.) However, plaintiffs proffer no admissible evidence of these statements.[2]

### B. Statements in Hutton Galleries' Catalogue

In a catalogue accompanying the Hutton Galleries' February and March 1995 show of Khidekels owned by Mark and Regina, Ingrid Hutton wrote: "[W]e present *for the first time anywhere* the work of Lazar Markovich Khidekel." (Pl.Ex. G.) (emphasis added.) The Boulés object to this statement because a 1992 show at Quebec's Musée d'art de Joliette had featured Khidekels owned by the Boulés. Hutton also wrote that neither "[Khidekel] [n]or his family ever [sold] or part[ed] with any of his works." (*Id.*) These statements appeared in the second paragraph of the section of the catalogue entitled "ABOUT THIS EXHIBITION by Ingrid Hutton."

### C. Repudiation Letter to Museums

In January 1996, Mark, Regina and Hutton sent a letter under the letterhead of Hutton Galleries to at least 25 museums in the United States, Europe and possibly Australia which had exhibited Russian avant-garde art (the "repudiation letter"). (Def. 56.1 ¶ 87; Def. Ex. G (Hutton Dep.) 118–121.) The letter reads as follows:

> "This is to inform you that we, the undersigned, Mark Khidekel and Regina Khidekel, the heirs of Lazar Markovich Khidekel, and Ingrid Hutton, completely repudiate the catalogue of the exhibition of works by Lazar Markovich Khidekel published by the Musée d'art de Joliette, Quebec, Canada in 1992. We will not permit this catalogue to be cited in connection with any works by Lazar Markovich Khidekel coming from the Khidekel

---

**2.** René states in an affidavit that Railing was "expressly informed by defendants that our works and the certificates of authenticity were 'fake.'" (René Aff. ¶ 45.) René's statement about what was said to Railing is not admissible. Plaintiffs also point to Ingrid Hutton's deposition testimony that in 1996, she had a discussion with Railing about her planned exhibition on Suprematism. (Hutton Dep. 117.) Hutton testified that she did not recall discussing the Boulés' collection with Railing. (*Id.*)

Family or from the Leonard Hutton Galleries nor should this catalogue be cited by any other person or institution as reference material or in any other way in connection with works by Khidekel coming from the Khidekel Family or the Leonard Hutton Galleries."

(Def.Ex. J.) The Joliette catalogue was produced in connection with the 1992 Canadian exhibition and noted that the Boulés had loaned the works in the exhibition. In that catalogue, the curator, Antoine Blanchette, had included a note of appreciation to Mark.[3] (Pl.Ex. B.) It had been expected that Mark would attend and participate in the show, although he did not. (Pl.Ex. W; Pl. 56.1 ¶ 53.)

Mark said that he conceived of the letter because he had seen a catalogue from the Jewish Museum, which was organizing a traveling exhibition of Russian Jewish artists which included Khidekels owned by Mark and Regina and consigned with the Hutton Galleries. (Mark Dep. 271–72; Hutton Dep. 82–83.) The Jewish Museum catalogue cited both the Joliette catalogue and the Hutton catalogue in its bibliography, and Mark "didn't want to mix or to blend the works from the two sources." (Mark Dep. 272; Pl.Ex. BB.) The Khidekels that were reproduced in the Jewish Museum catalogue were lent by the Hutton Galleries. (Pl.Ex. BB.)

### D. Statements to ARTnews Reporters

In its February 1996 issue, ARTnews published a 13–page article entitled "The Betrayal of the Russian Avant Garde." (Pl.Ex. AA.) The article reported on the prevalence of incorrectly attributed works in the Russian avant-garde field, and discussed paintings by several artists, including Khidekel. It quoted Mark and Regina about the large number of fake Khidekels.:

> "[W]hen [Mark and Regina] finally saw the works, which belong to Paris collectors Claude and René Boulé, they were

... puzzled. 'I don't know whether they're fakes or works of somebody else,' says Regina. 'I only know, and we are absolutely sure, that they have nothing to do with Khidekel.' "

The ARTnews reporters further wrote, "Mark and Regina say that they told the Boulés the works were not Khidekels. The Boulés now dispute this, insisting that Mark and Regina first approved the works." The article noted that Khidekel had been the subject of a recent exhibition at the Hutton Galleries, and reported that, according to Mark and Regina, neither Khidekel nor his family ever had sold or parted with any of his works. It quoted Regina as follows: "We lived together. [Mark and I] were witnesses to everything, we know who was in our apartment, who visited us, and we know nothing went away."

The article also quoted Hutton regarding the problem of authenticity of Russian avant-garde works generally, but did not quote her with respect to Khidekel. The complete discussion of Khidekel that appeared in the ARTnews article is attached to this Opinion as Appendix A.

On this motion, Mark and Regina Khidekel and Ingrid Hutton do not dispute that they made the statements attributed to them in the ARTnews article. ARTnews is published in New York. René testified that ARTnews has an international readership and that "[w]hen ARTnews speaks, collectors, gallery owners, dealers, museums and auction houses throughout the world listen." (René Aff. ¶ 40.)

The Complaint avers that three Montreal publications subsequently published articles discussing the Khidekel dispute. (Compl. ¶¶ 54, 55.) Neither plaintiffs nor defendants submit two of the articles. The third, a March 3, 1996 article in The Gazette, reported as follows:

---

**3.** In a section of the catalogue entitled "Acknowledgments," Blanchette "offer[ed][her] sincere thanks" to 18 individuals and one museum. One of these was Mark Khidekel, "who has provide[d] interest and support." (Pl.Ex. B.)

"A prominent New York City art gallery director charged last week that Antoine Blanchette, a Joliette dealer collector and guest curator of the museum's Lazar Khidekel show, offered in 1994 to sell her a half dozen supposed Khidekels that she immediately dismissed as suspect.

'I told him that I didn't think they were right.' Ingrid Hutton, director of the Leonard Hutton Galleries, told *The Gazette* about Blanchette['s] visit.

'Mine look different' said Hutton, who deals only with Khidekels provided by the artist's son Mark and his wife, Regina.....

But Blanchette said this week that he could not remember Hutton dismissing the Khidekels he presented as fakes."

(Def.Ex. K.) The article also reported that, according to Blanchette, the Khidekels he showed to Hutton belonged to the Boulés. (*Id.*) In addition, the article reported: "Mark and Regina Khidekel, who told *ARTnews* that the Boulé Khidekel[s] aren't real, said they only want the collection submitted to an independent expert analysis to determine its authenticity." (*Id.*)

## IV. Defendants' Exhibition and Sales of Khidekels

Mark and Regina Khidekel own several hundred works of Lazar Khidekel. (Pl.Ex. K (Regina Dep.) 150; Pl.Ex. J (Mark Dep.) 264.) Beginning at some point prior to February of 1995, they consigned some of their collection to the Hutton Galleries for sale. (Pl.Ex. K (Regina Dep.) 149; Pl.Ex. L (Hutton Dep.) 73–74.) As of December of 1997, Hutton Galleries had sold three works pursuant to the consignment. (Pl.Ex. K (Regina Dep.) 149; Pl.Ex. L (Hutton Dep.) 83.) Hutton Galleries presented an exhibition in February and March of 1995 featuring Khidekels owned by Mark and Regina (brochure at Pl.Ex. G).

## V. Boulés' Exhibition and Sales of Their Collection

René testified that "[a]fter the middle 1980's, when our son became terminally ill ..., it was our intention to stop collecting art for awhile and instead to offer for sale, at an appropriate time and place, a substantial part of our Khidekel collection." (René Aff. ¶ 7.) Slava Kogan, an art dealer who is acquainted with the Boulés, stated the following in his affirmation: "Over the years I have discussed with the Boulés the question of what they wished to do with their art collection. They told me that they wished to keep some of the works they loved most. But they also asserted that they intended to sell some of their works, including part of their Khidekel collection." (Kogan Aff. ¶ 8.)

The Boulés sold eleven of their Khidekels to Antoine Blanchette, a Canadian art dealer who was the curator of the Joliette exhibition, prior to the 1992 exhibition. (Def. Ex. D (Claude Dep.) 49–51, 135–36.) Claude Boulé described the genesis of the sales as follows: "First, he liked them, but we were preparing the exhibition together, and then he showed his desire to buy them. He was very keen about this artist." (Def. Ex. D (Claude Dep.) 51.)

In an April 1995 agreement, the Boulés consigned four Khidekels to the Flak Gallery of Paris for sale at a Frankfurt art fair. (Pl.Ex. Z; Pl Ex. I (Claude Dep.) 174–75.) None of these were sold, although according to Edith Flak, "there [was] true interest [expressed] in those Khidekels." (Pl.Ex. P (Flak Dep.) 14.)

In late 1995, following the Frankfurt art fair, the Boulés and Edith Flak of the Flak Gallery entered into an oral agreement for Flak to buy at least 50 of the Boulés' Khidekel watercolors and sell them to the general public.[4] (Pl.Ex. P (Flak Dep.) 18–

---

**4.** Through a French interpreter, Flak described the oral agreement as follows: "So we tried to set up a patent [*sic*] for purchas-

, ing Khidekels from the Boulés. We thought in terms of about fifty. Which we wouldn't buy all at the same time obviously. We would

21, 26–28; Pl.Ex. I (Claude Dep.) 187–89.) It was agreed that the Flak Gallery would pay the Boulés 40,000 francs for each work. (Pl.Ex. P (Flak Dep.) 27.) Flak refused to perform that agreement in 1996 following the February 1996 publication of the *ARTnews* article, which Flak described as a "bombshell." (Pl.Ex. P (Flak Dep.) 30–35.) "[The article] cast suspicion on everything we had tried to do before." (*Id.* at 30.)

The Flak Gallery is located on the Rue des Beaux–Arts, which plaintiffs' counsel describes as "one of the major art thoroughfares of Paris." (Pl. 56.1 ¶ 87.) René testified that he and his wife "expected" that the Flak Gallery "would have offered the works [from the Boulés' collection] for sale, in significant number, to Americans or in America." (René Aff. ¶ 47.) The Flak Gallery participated in the Tribal Antiques Show held in New York in October 1998. (Rosenberg Aff. ¶ 8 & Ex. D.)

In approximately 1995, Patricia Railing, a British scholar, began to assemble a collection of works to be shown at the University of Iowa art museum under the title, "The Faces of Suprematism." Railing corresponded with the Boulés about the inclusion of Khidekels from their collection. In an April 1, 1996 letter, for instance, she indicated that the museum would be requesting the loan of some of their works. (Pl.Ex. R.) Claude Boulé testified that Railing stopped writing to her— implicitly withdrawing the offer—after the publication of the *ARTnews* article. (Pl. Ex. I 237.) However, the *ARTnews* article was published in February 1996 (prior to the Railing letter referenced above). Plaintiffs do not proffer evidence showing that the Iowa exhibition was ultimately held, and Claude testified that she did not know whether the exhibition was held. (Pl.Ex. I (Claude Dep.) 237.)[5]

In addition to the Joliette show and the Frankfurt art fair, the Boulés exhibited Khidekels from their collection at the Château de Tanlay in France and the Centro de Exposiciones y Congresos, in Zaragoza, Spain in 1993. (René Aff. ¶ 17.)

Plaintiffs do not allege that their works were offered for sale at these two exhibitions, and Claude specifically stated in her deposition that the Tanlay exhibition did not offer works for sale. (Pl.Ex. I 170.)

Between 1986 and 1988, Claude sold a book she wrote on constructivism to book sellers in New York. (René Aff. ¶ 4.)

## VI. International Art Market

René testified that "[t]here is a single, integrated worldwide art market for works of the first order.... [M]ajor collectors from around the world attend [shows in the United States, Western Europe and Japan], directly or through proxies." (René Aff. ¶ 39.) "Auctions, major sales, and major shows in London, Paris, Tokyo and other capital cities ... have a direct and felt impact in New York City and other art capitals." (*Id.* ¶ 40.)

## DISCUSSION

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see*

first buy ten or twelve and show them. And then in the light of the reactions in Paris, we would with time buy more. All in all a minimum of fifty. And it was understood that the Boulés would give us the exclusive rights to sell their collection." (Pl.Ex. P (Flak Dep.) 19.) Flak also testified that most of the agreements entered into between dealers and collectors are oral agreements. (*Id.* at 20.)

5. Plaintiffs' counsel presumes that the exhibition was not held; in the memorandum of law, counsel refers to it as the "yet-unrealized Railing exhibit in Iowa." (Pl. Mem. at 12.) In a footnote, counsel states, without citation to evidence, that "Once defendants' statements about the Boulé collection were publicized, however, Railing discontinued her pursuit of such an exhibition." (*Id.* at 13 n. 9.)

*also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). Nevertheless, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

Plaintiffs' federal claim arises under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section provides in pertinent part:

"Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

 . . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a)(1). Plaintiffs complain primarily about defendants' statements of fact misrepresenting the nature and characteristics of *plaintiffs'* "goods" (statements that the Boulés' Khidekels were not authentic), and also complain about two statements of fact misrepresenting characteristics of *defendants'* "goods" or "commercial activities" (the statement in the Hutton Galleries' 1995 catalogue that "[w]e present for the first time anywhere the work of ... Khidekel" and the statement in the catalogue that neither "[Khidekel] [n]or his family ever [sold] or part[ed] with any of his works").

*I. The Boulés' Commercial Interests*

The plain language of the statute affords standing to "any person who believes that he or she is or is likely to be damaged" by a false description of fact "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1).

■ Under the Second Circuit's interpretation of the statute, a plaintiff is required to demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims, and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising. *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997) (quoting *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir. 1994)).

■ The Second Circuit has held that consumers do not have standing to sue for false advertising under section 43(a). *Colligan v. Activities Club of New York,, Ltd.,* 442 F.2d 686 (2d Cir.1971). In so holding, the court stated that "[t]he Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Id.* at 692. (citing 15 U.S.C. § 1127). Subsequent to the *Colligan* decision, courts in this circuit have regularly stated that only commercial parties have standing to sue for false advertising under the Lanham Act. *See, e.g., PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 125 (2d Cir.1984) ("What matters [for standing] is whether a commercial party has a 'reason-

able interest to be protected' against the alleged false advertising."); *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521, 1533 (S.D.N.Y.1994) ("Suit may be brought only by a commercial plaintiff who can prove that its interests have been harmed by a competitor's false advertising.").

The plaintiffs do not dispute this. The issue in dispute is whether the Boulés have the kind of commercial interest that entitles them to sue under the Lanham Act. A commercial interest under the Lanham Act is not simply an economic interest. To treat any economic interest as a commercial interest would strain the words of the statute. Moreover, equating "commercial" interest with "economic" interest would afford standing to consumers. In holding that consumers do not have standing, the *Colligan* court was not persuaded otherwise by the fact that the consumers in that case had an economic interest at stake.

■ In this case, plaintiffs have shown more than a mere economic interest in what they own. In addition to a series of casual sales, they consigned four works for exhibition and sale and had a contract with the Flak Gallery for the sale of 50 works in their collection. The 50 works that were subject to the contract represent a significant portion of the known works of Lazar Khidekel. According to the defendants, Mark and Regina own all of the extant Khidekels, and they claim to own several hundred Khidekels. The Boulés also had given the Flak Gallery the exclusive right to buy the other Khidekels in their collection.

In the context of the art market, where plaintiffs own a significant percentage of the extant works attributed to one artist, where plaintiffs have taken steps to promote their collection, and where plaintiffs contracted to sell a substantial number of those works, plaintiffs have a sufficient commercial interest at stake to give them

standing to sue under section 43(a) of the Lanham Act.

Moreover, defendants have treated plaintiffs as competitors. The Khidekels arguably were aware of the Boulés' intention to sell their collection. According to the Boulés' testimony, they paid Mark to produce certificates of authenticity which facilitate sales in the commercial art market. The plaintiffs have proffered evidence that the repudiation letter, sent under the letterhead of a commercial art gallery that was selling Khidekels, was intended to disparage a competing collection of Khidekels.

The facts of this case are unusual, and the authorities cited by the parties are not on point. Nevertheless, the cases do show that plaintiffs who are not traditional commercial entities have been held to have standing to sue for false advertising under the Lanham Act. For instance, in *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236 (S.D.N.Y.), *aff'd without opinion*, 923 F.2d 845 (2d Cir.1990), the trustee of the trusts established by the author of a leading medical treatise sued the publisher and author of the successor treatise for false advertising. Judge Cannella held that because the trusts are entitled to a royalty for all sales of the treatise, they had a sufficient "pecuniary stake ... that makes them a business competitor of defendants." *Id.* at 242. Judge Cannella specifically acknowledged that the plaintiffs were not in the business of writing medical treatises.

## II. Lack of U.S. Sales by Plaintiffs

Defendants argue that Congress did not intend the Lanham Act to provide a remedy to the citizens of a foreign country who have had no commercial dealings in the United States.[6]

They specifically do not argue that Congress lacks the power to regulate the activities sued on in this case. (Def. Mem. at

---

**6.** Defendants present this as an argument that there is no subject matter jurisdiction. It is better understood as an argument that plaintiffs do not have standing.

15.) It is undisputed that most of the conduct of which plaintiffs complain occurred in the United States, and that there is jurisdiction over the defendants.[7]

Defendants rely on 15 U.S.C. § 1127, which provides that:

"The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; *to protect persons engaged in such commerce against unfair competition* . . . ."

(Emphasis added.) According to defendants, this language modifies the operative language of section 43(a), which provides that "*any person* who believes that he or she is or is likely to be damaged" may sue. 15 U.S.C. § 1125(a) (emphasis added).

Defendants argue that plaintiffs are not engaged in commerce "within the control of Congress" because they did not purchase, sell or exhibit their collection in the United States and have never engaged in any art-related activity in or with the United States or its citizens. Defendants also claim that the only lost sales alleged by plaintiffs would have occurred in Europe.

Defendants cite no cases that support their position that the intent provision of the Lanham Act narrows section 43(a) in the way that they argue. Defendants rely on *Colligan*, which placed weight on the intent provision in concluding that Congress did not intend to give consumers standing to sue for false advertising. They also rely on *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) and *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir.1956). Those cases are inapposite. They deal only with the issue of whether the Lanham Act applies to a defendant's conduct outside of the United States.

A more instructive case is *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*, 761 F.Supp. 1041 (S.D.N.Y.1991). There, a foreign cotton growers' association, as well as several West Indian governments and two West Indian garment manufacturers, sued New York textile marketers alleging false advertising and misrepresentation under section 43(a) of the Lanham Act. Defendants moved for summary judgment on the ground that plaintiffs lacked standing, arguing that they did not sell the relevant goods in the United States. Plaintiffs contested this, and submitted affidavits that there had been sales of cotton goods in the United States certified by plaintiff association. Judge Ward held that a factual question existed as to whether plaintiffs have a "reasonable interest to be protected," and accordingly did not grant defendants' motion. Judge Ward stated that a plaintiff need not show "a high level of direct commercial activity in the United States" "in order to have Lanham Act standing to assert claims of false advertising and false designation of origin." *Id.* at 1049. Whether the level of activity is sufficient will depend on the nature of the market:

"[The] rarity and exclusivity of a product must . . . be considered when assessing the commercial interest of a plaintiff in the United States market. Certainly, a plaintiff producer of a rare commodity cannot be expected to demonstrate the same level of commercial activity in any given market as the producer of mass-marketed goods."

*Id.* at 1050.

■ Assuming that it is necessary for plaintiffs to show some commercial activity in the United States, they have done so. The Boulés had discussions with Patricia Railing about the display of their Khidekels at the University of Iowa art museum.

---

**7.** The only conduct charged against the defendants that occurred outside of the United States is Ingrid Hutton's statement to Yvette Moch. As is discussed below, defendant's motion for summary judgment on that portion of the Lanham Act claim is granted on other grounds.

(The Boulés allege that the invitation was withdrawn because of the defendants' disparaging statements.) While a museum exhibition is not a direct commercial activity, there is evidence that museum exhibitions relate closely to the commercial market for art.

There is evidence that the market for Russian avant-garde art is small, specialized and global. Only a handful of art galleries in the world specialize in this type of art. Hutton Galleries is one such gallery, and the Flak Gallery hoped to become such a gallery. The Boulés had a contract to sell 50 works to the Flak Gallery, and the gallery had the exclusive option to make additional purchases from the Boulés. The record suggests that 50 works constitute a significant portion of the works by or attributed to Khidekel that are available for sale worldwide. If the Flak Gallery had not canceled its contract with the Boulés, the Flak's offering of the 50 works would have had a substantial effect on the worldwide market for Khidekels, including that in the United States. The only other major collection appears to be in the United States and a portion of that collection has been consigned to Hutton Galleries in New York.

Moreover, René testified that he expected the Flak Gallery to offer for sale a significant number of works from the Boulé collection to United States citizens or in the United States. Concrete plans to enter a market can be sufficient to confer standing to sue for false advertising under the Lanham Act. *See, e.g., West Indian Sea Island Cotton Ass'n,* 761 F.Supp. at 1049 n. 5; *National Lampoon, Inc. v. American Broadcasting Companies, Inc.,* 376 F.Supp. 733, 746 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2d Cir.1974).

### III. Statements in Hutton Galleries' Catalogue

■ The Hutton Galleries' catalogue, which was issued in February 1995 in connection with the gallery's exhibition of the Khidekel works which it offered for sale, was "commercial advertising or promotion." The two statements in the catalogue text which plaintiffs claim are false are: 1) "[W]e present for the first time anywhere the work of Lazar Markovich Khidekel;" and 2) neither "[Khidekel] [n]or his family ever [sold] or part[ed] with any of his works." (Pl.Ex. G.)

These clearly were statements of fact regarding the goods of defendants and were made for the purpose of promoting their sale. They represent to the public that any potential buyer of a work by Lazar Khidekel must come to the Hutton Galleries and buy one of the Khidekels on sale at that gallery. These are statements which, if false, are likely to cause damage to any competing seller. Accordingly, plaintiffs have raised a genuine issue of disputed fact with respect to these statements.

### IV. Repudiation Letter

Defendants argue that the January 1996 repudiation letter was not a "representation of fact" and therefore is not actionable under section 43(a).

■ The repudiation letter was not a statement of fact about anyone's goods. Defendants stated that they "completely repudiate" the Joliette catalogue. They also stated that they "will not permit this catalogue to be cited in connection with any works by ... Khidekel coming from the Khidekel Family or from the Hutton Galleries." (The Joliette catalogue contained reproductions of the Boulés' Khidekels and obliquely suggested that Mark Khidekel supported the exhibition.) The statements do not make any factual assertions about any paintings.

Plaintiffs argue that a reasonable trier of fact could conclude that, "when this letter is read in the context of the other statements made by the Khidekel and Hutton Defendants," the letter was equivalent to a statement that the Khidekels in the Boulés' collection are inauthentic. (Pl. Mem. at 18.) A statement that is not on

its face a statement of fact but that could be reasonably interpreted as a statement of fact may be actionable under the Lanham Act in some circumstances. *See generally American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir.1978) (plaintiff can sue under the Lanham Act where advertisement is literally true but nevertheless is likely to mislead or confuse consumers).

Plaintiffs present no evidence, however, that a recipient of the letter was likely to understand it as a representation of fact concerning the nature, characteristics or qualities of their or the defendants' goods. The most important contextual factor to which plaintiffs point in support of their position was not present at the time the letter was sent. At the time the letter was sent, the *ARTnews* article had not yet been published.

Moreover, there is no evidence that Hutton's alleged statements to Moch, Kogan and Blanchette that the Boulés' Khidekels were inauthentic were disseminated beyond those individuals, and the Boulés have not proffered evidence showing that any of the recipients of the repudiation letter had also seen the Hutton Galleries' catalogue. The Boulés have proffered no other evidence showing that recipients of the letter understood it to be asserting a fact about either their Khidekels or the Hutton Khidekels. *See generally Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297 (2d Cir.1992) ("Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers.") Accordingly, a reasonable finder of fact could not reasonably conclude that the repudiation letter was equivalent to a statement of fact. It is therefore not actionable as false advertising under the Lanham Act.

## V. *Individual Oral Statements and Statements in ARTnews*

Defendants argue that the statements allegedly made in individual conversations and to *ARTnews* were not "in commercial advertising or promotion" as is required by section 43(a). 15 U.S.C. § 1125(a)(1)(B).

### A. *Oral Statements to Moch, Kogan and Blanchette*

Plaintiffs sue on statements that Ingrid Hutton allegedly made in conversations with Yvette Moch, Slava Kogan and Antoine Blanchette. These statements, as they are alleged, were not made "in commercial advertising or promotion" as is required by the Lanham Act.

Although "advertising" and "promotion" are not defined by the Act, the words connote reaching out to consumers. They connote proactive, not merely reactive, communication. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 942 F.Supp. 209, 215 (S.D.N.Y.1996). In addition, in order to constitute "commercial advertising or promotion" under section 43(a)(1)(B), the representation must be disseminated sufficiently to the relevant purchasing public. *Id.* at 216. The level of required dissemination will vary from industry to industry and from case to case. *Id.*

Here, there is evidence of only isolated statements by Hutton to three individuals. The statements to Moch and Kogan were reactive, and there is no evidence that Hutton initiated the alleged conversation with Blanchette. In fact, Blanchette denied that Hutton told him that the works were inauthentic. Moreover, there is no evidence that Moch, Kogan or Blanchette repeated the statements to anyone other than the Boulés. Under these circumstances, the three isolated statements cannot be considered "commercial advertising or promotion" within the meaning of the Lanham Act.

## B. Statements to ARTnews

■ On this motion, defendants concede that *ARTnews'* quotation of their statements was accurate. But they contend that the statements were not made "in commercial advertising or promotion." They similarly argue that the Khidekels' statements to *ARTnews* were not made "on or in connection with any goods or services."

There is strong evidence that the statements printed in *ARTnews* damaged the commercial interests of plaintiffs and promoted the commercial interests of the speakers. It is undisputed that the statements were widely disseminated.

However, there is no evidence that Mark or Regina Khidekel initiated contact with the *ARTnews* reporters or took any other proactive or affirmative steps with respect to the *ARTnews* article. The article documented the general problem of authenticity in the Russian avant-garde market and addressed the works of many artists. The four *ARTnews* reporters who covered the story interviewed many people in the course of their five-month investigation. Eighteen individuals are quoted by name in the article, and the reporters wrote that they interviewed "art historians, collectors, dealers, conservators, and the heirs of Russian avant-garde artists in the United States, Germany, Russia, England, France, and Ukraine."

While section 43(a) applies to commercial advertising or promotion beyond the traditional advertising campaign, it does not cover a response to an unsolicited inquiry by a magazine reporter seeking comment on a topic of public concern. *See Fendi*, 942 F.Supp. at 215 ("[t]he words of the statute .... connote proactive, not merely reactive, communication"). The Boulés have not proffered any evidence that the article or the part on Khidekel was instigated by any of the defendants. The fact that the Khidekels had an economic interest in making their statements to the *ARTnews* reporters does not alone transform their comments into "commer-cial advertising or promotion." *See generally Gordon and Breach Science Publishers v. American Institute of Physics*, 859 F.Supp. 1521, 1541 (S.D.N.Y.1994) ("[t]he fact that [defendants] stood to benefit from publishing [the survey] results—even that they intended to benefit—is insufficient by itself to turn the articles into commercial speech" subject to Lanham Act scrutiny).

Plaintiffs have the burden of proving that the Khidekels' statements to the *ARTnews* reporters which were printed in the *ARTnews* article were made "in commercial advertising or promotion." They have failed to proffer evidence sufficient to sustain this burden.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. The Lanham Act claim is dismissed except with respect to the statements in the Hutton Galleries' catalogue.

SO ORDERED.

## APPENDIX A

The following is the complete discussion of Khidekel that appeared in the article published in the February 1996 issue of *ARTnews*:

> Lazar Khidekel (1904–1986), the subject of a recent exhibition at the Leonard Hutton Galleries, was a student of Malevich and one of his closest collaborators in UNOVIS (Affirmers of New Art), the group Malevich founded in Vitebsk in 1919. A talented artist of the younger generation of the Russian avant-garde, he flourished during the creative ferment of the 1920s and later became a highly successful architect and teacher. But his Suprematist paintings could not be exhibited. He never had a solo show during his lifetime, nor did he or his family ever sell or part with any of his works, according to his son and daughter-in-law, Mark and Regina Khidekel.

On this point, they are adamant. "We lived together. [Mark and I] were witnesses to everything, we know who was in our apartment, who visited us, and we know nothing went away," says Regina Khidekel.

So when Mark and Regina learned, in the mid–1980s, that there was a collection of Khidekel's works in Paris, they were puzzled and intrigued by the idea that Khidekel had a Western admirer. But when they finally saw the works, which belong to Paris collectors Claude and René Boulé, they were even more puzzled. "I don't know whether they're fakes or works of somebody else," says Regina. "I only know, and we are absolutely sure, that they have nothing to do with Khidekel."

They also wondered where so large a collection—about 200 works, primarily watercolors—that were unknown to them could have come from. The Boulés refused to tell them.

Mark and Regina say that they told the Boulés the works were not Khidekels. The Boulés now dispute this, insisting that Mark and Regina first approved the works. In any case, the Boulés continued to believe that their collection was genuine and exhibited it at the Musée d'Art de Joliette in Quebec in 1992. A catalogue accompanied the show, with an introduction by the French scholar Jean–Claude Marcadé. What makes Mark and Regina most indignant is that the catalogue gives the impression that they endorse the Boulé collection, which they most emphatically do not. Later, they also told Marcadé that the Boulé works were not Khidekels, so they were shocked when he illustrated two of them in his 1995 book, *L'Avant–Garde Russe, 1907–1927*.

Mark and Regina know there are a lot of fake Khidekels. The notorious Natan Federowskij, a Russian émigré dealer in Berlin who committed suicide in 1994, had about 200, according to Regina. He told her that he thought they were genuine until he showed them to George Costakis, who advised him to throw them away, whereupon he sold them to a New York dealer.