**René BOULÉ and Claude Boulé, Plaintiffs,**

v.

**Ingrid HUTTON, Leonard Hutton Galleries, Inc., Mark Khidekel and Regina Khidekel, Defendants.**

No. 97 Civ. 144(MGC).

United States District Court, S.D. New York.

March 30, 2001.

Rosenman & Colin LLP, New York, New York, By: Gerald A. Rosenberg, Sta-

cey B. Creem, David M. Powers, for Plaintiffs.

Pollet & Felleman, LLP, New York, New York, By: George P. Felleman, Elizabeth Koltun, for Defendants.

### OPINION

CEDARBAUM, District Judge.

This action arises from a dispute over the authenticity of certain works of art attributed to Lazar Khidekel, who was born in Vitebsk in 1904 and has been associated with the Suprematist movement in Russian art. In 1918, Khidekel entered the Vitebsk School of Art. Kazimir Malevich was the theorist and leader of the Suprematist movement, and is the movement's most widely recognized and celebrated artist. When Malevich arrived in Vitebsk in November 1919, Khidekel became one of Malevich's pupils. Additionally, Khidekel was a member of UNOVIS ("Affirmers of the New Art"), a group that Malevich founded at Vitebsk in 1920. Other members of UNOVIS included Ilya Chashnik and Nikolai Suetin. In 1922, Malevich moved to Petrograd, along with some members of UNOVIS, including Khidekel. In that same year, Khidekel became a student of architecture at the Petrograd Institute of Civil Engineering. Although he continued to create works of art during the 1920's, from 1930 to 1985, Khidekel taught architecture at the Leningrad Institute of Civil Engineering. In 1986, Lazar Khidekel died in the former Soviet Union at the age of 82.

Claude and René Boulé, Parisian art collectors who own 161 works attributed to Khidekel, filed this action against Mark and Regina Khidekel, a son and daughter-in-law of the artist, as well as Ingrid Hutton and the Leonard Hutton Galleries, the art dealer and art gallery that exhibited and offered for sale the collection of Khidekel works that Mark and Regina inherited from the artist. The Boulés sue under the Lanham Act, 15 U.S.C. § 1125(a), claiming that certain statements attributed to the defendants falsely disparaged the authenticity of the Boulés' collection in order to promote the sale of the Khidekel paintings at the Hutton Galleries. The only Lanham Act claim that survived partial summary judgment is a claim against the Hutton defendants for statements in their exhibition catalog in early 1995. *See Boulé v. Hutton et al.,* 70 F.Supp.2d 378 (S.D.N.Y.1999). The Boulés also assert various pendent state law claims which arise from the same nucleus of operative fact, including violations of the New York General Business Law, product disparagement, defamation, tortious interference with business relationships, common law unfair competition, unjust enrichment, breach of contract, common law fraud, prima facie tort and the tort of "false light." The majority of these claims required the Boulés to prove the falsity of defendants' statements that impugn the authenticity of the Khidekels owned by the Boulés.

A bench trial was held from September 27, 2000 through October 6, 2000. In addition to the testimony of Claude and René Boulé, plaintiffs presented the testimony of Patricia Railing, an art historian who lives in England, Jean–Claude Marcadé, a French art historian and researcher at the Centre National de Recherche Scientifique in Paris, Samuel Palenik, an analytical forensic microscopist, Andrew Sulner, a forensic document examiner, and Serge Essaian, a Russian artist who lives in Paris. Plaintiffs also submitted deposition testimony of Yvette Moch, a former employee of the Chauvlin gallery in Paris and organizer of a Russian avant-garde exhibition at the Centre d'Art Contemporain in Tanlay, France, Helene Larroche, owner of Itinéraires, a Paris bookstore and art gallery, and Edith Flak, owner of the Flak

Gallery in Paris. In addition to the testimony of Ingrid Hutton and Mark and Regina Khidekel, defendants presented the testimony of Alexandra Shatskikh, a Russian art historian employed by the Research Institute of Art History in Moscow, and Eugena Ordonez, an art conservator and technical analyst.

### FINDINGS OF FACT

After examining all the evidence, observing the demeanor of the witnesses and considering the plausibility and credibility of the testimony, I make the following findings of fact.

1. Claude and René Boulé currently own 161 works on paper and one oil painting attributed to Lazar Khidekel, as well as works of Larionov, Kogan, Sofranova, Yudine, and Cahvovra.

2. The Boulés purchased 176 works on paper attributed to Khidekel over a period of four years, beginning in 1984, from a private dealer named Vladmir Tsarenkov whom Claude Boulé met outside of the Hotel Druout. Tsarenkov requested that the Boulés conceal his identity.

3. The Boulés paid a total of 1.5 million French Francs ("FF") in cash to Tsarenkov for the works.[1]

4. Tsarenkov did not provide the provenance of any of the works that he sold to the Boulés.

5. In 1991, the Boulés also purchased for £2,800 an oil painting attributed to Khidekel, "Suprematist Composition," from a Sotheby's auction in England.[2]

6. In the summer of 1988, Jean–Claude Marcadé brought Mark Khidekel to the Boulés' home in Paris. At that meeting, Claude showed Mark 20 to 25 Khidekel works. Mark appeared moved that his father had admirers in Paris, and did not express any skepticism about the authenticity of the Boulés' works at that time. Claude is fluent in French and is able to understand and speak some English and Russian. Mark is fluent in Russian and is able to understand and speak some English. Marcadé, who is fluent in both Russian and French, acted as an interpreter at this meeting and at all subsequent meetings at which he was present.

7. In 1989, Helene Larroche, owner of the Itinéraires book store and art gallery, proposed a joint exhibition of the Khidekel collections of the Boulés and of Mark. On July 25, 1989, the Boulés and Mark signed an agreement for this joint exhibition.

8. The Itinéraires exhibition was canceled because Mark failed to furnish his father's works by the date specified in the agreement.

9. When Mark visited the Boulés in July 1989, he gave Claude a photograph of his father as a gift, and he noted that his father had personally framed the photograph.

10. In March 1990, Larroche arranged for Regina to meet the Boulés. At this meeting, Regina apologized for Mark's failure to comply with the agreement for the joint exhibition and attributed this failure to the political upheaval surrounding the dissolution of the former Soviet Union in the fall of 1989.

11. Claude informed Regina that the Boulés were planning to lend their Khidekel works to an exhibition at the Joliette Museum of Art in Montreal, Canada. Regina did not express any objection to the Boulés' display of their works at the Joliette exhibition.

---

1. At the relevant exchange rates, this sum was equivalent to approximately $201,000.

2. At the relevant exchange rates, this sum was equivalent to approximately $4,200.

12. On June 6, 1991, Mark, accompanied by Serge Essaian's daughter and Jean–Claude Marcadé, visited the Boulés at their home. Mark gave the Boulés a ceramic vase as a gift and inscribed the photograph of his father which he had given to the Boulés in 1989. At this visit, Mark asked whether he could display his Khidekel collection with the Boulés' collection at the Joliette exhibition. Claude told Mark that since limited funds had been allotted for the exhibition, it would not be possible to include Mark's works, but Mark could request an invitation to lecture at the exhibition.

13. On June 9, 1991, Mark, Regina, and Marcadé joined the Boulés and two of the Boulés' children for lunch at the Boulés' home in Paris. Mark and Regina expressed their desire to attend the Joliette exhibition in order to show slides of their own collection. Mark and Regina also commented that they would like to lecture at the Joliette exhibition about Khidekel and his works. Mark and Regina did not express any reservations regarding the authenticity of the Boulés' collection.

14. Mark and Regina made an unexpected visit to the Boulés' home on June 11, 1991. They arrived without an interpreter and communicated with Claude using a combination of Russian, English, French and hand signals. Mark said that he wished to show Claude slides of his father's works. Claude then reciprocated by showing her Khidekel collection. At this time, a substantial portion of the Boulés' Khidekel collection was in transit to the Joliette exhibition. Claude showed Mark all of the original works that remained at the Boulé residence and slides of the remaining works. Mark noted some differences between the Boulés' collection and his collection, and commented that the bulk of the Boulés' collection was created when Lazar Khidekel was a very young student—possibly as early as 1920.

15. At some point during the June 11 meeting, Mark agreed to sign certificates of authenticity for the Boulés. Mark insisted on receiving cash for the certificates, because he did not have a checking account and would be leaving Paris shortly. Since Mark insisted on being paid in cash, and the Boulés had only 40,000 FF on hand, Mark was willing to sign only 16 certificates, at a price of 2,500 FF per certificate. Mark chose among the 44 original works that remained at the Boulés' residence, examined the works closely with a magnifying glass and signed certificates of authenticity on the backs of photographs corresponding to the selected works. Regina was present at the time that Mark signed those certificates.

16. Fifteen of the certificates include the following statement: "I, Mark Khidekel, having examined the artwork shown to me measuring ..., hereby confirm that it is the work of my father, Lazar Khidekel, and that it can be identified as a study."

17. In November 1991, Claude conveyed Mark and Regina's request to participate in the Joliette exhibition. In the spring of 1992, Mark wrote a letter to the Joliette museum containing his and Regina's passport numbers and noted that he and Regina would be available to lecture on a variety of subjects. The letter also noted that he and Regina would be accompanied by their 11–year–old son Roman. The Khidekels ultimately did not participate in the Joliette exhibition.

18. The Boulé collection was exhibited in different galleries throughout Canada from August 1992 to August 1993.

19. Following the Joliette exhibition, Yvette Moch requested that the Boulés lend two watercolors and their oil on can-

vas to the Chateau de Tanlay exhibition in Tanlay, France.

20. At the end of 1994, Patricia Railing asked the Boulés to lend some of their Khidekel collection to an exhibition at the University of Iowa which was to be entitled "The Faces of Suprematism." Ultimately, for financial reasons, the University of Iowa exhibition was not held.

21. After learning that the Hutton Galleries exhibited, and offered for sale, some of Mark and Regina's Khidekel collection at the International Fair of Contemporary Art ("FIAC") in Paris in October 1994, the Boulés decided to sell some of their own Khidekel collection. The Boulés contacted Edith and Roland Flak, owners of a Paris gallery that specializes in 20th Century art, to sell some of the Boulés' Khidekel collection.

22. The Boulés consigned four of their Khidekel works to the Flaks for display at the April 1995 Art Messe in Frankfurt. The gallery had agreed to pay the Boulés 40,000 FF per work sold at the Art Messe, but no works were sold.

23. In December 1995, the Flaks orally agreed to purchase at 40,000 FF per work a group of works from the Boulé Khidekel collection over a two to three year period, but did not work out the details of when, and under what circumstances, payment would be made. The arrangement appears to have been a consignment with a fixed payment per work sold.

24. In 1995, the Hutton Galleries exhibited and offered for sale several dozen works on paper from Mark and Regina's collection at prices averaging over $18,000 each. Only four works were sold—including two works that had not been listed for sale.

25. From October 1994 through February 1996, the Khidekels and Ingrid Hutton made a number of statements that impugned the authenticity of the Boulés' Khidekel collection as follows:

(a) Statements by All Defendants

In January 1996, Mark, Regina and Hutton sent a letter on the letterhead of Hutton Galleries to at least 25 museums worldwide. The letter read as follows:

This is to inform you that we, the undersigned, Mark Khidekel and Regina Khidekel, the heirs of Lazar Markovich Khidekel, and Ingrid Hutton, completely repudiate the catalogue of the exhibition of works by Lazar Markovich Khidekel published by the Musée d'art de Joliette, Quebec, Canada in 1992. We will not permit this catalogue to be cited in connection with any works by Lazar Markovich Khidekel coming from the Khidekel Family or from the Leonard Hutton Galleries nor should this catalogue be cited by any other person or institution as reference material or in any other way in connection with works by Khidekel coming from the Khidekel Family or Leonard Hutton Galleries.

(b) Statements by the Hutton Defendants

In the catalog for the Hutton Galleries' February and March 1995 show of Khidekels owned by Mark and Regina, Hutton wrote: "We present for the first time anywhere the work of Lazar Markovich Khidekel. . . . In his lifetime [Lazar Khidekel] never had a solo show, nor did he or his family ever sell or part with any of his works." Yvette Moch testified that in October 1994, she approached Hutton in order to show her the catalog of the Tanlay exhibition. In particular, Moch wanted to show Hutton a reproduction of a painting by Popova. Hutton flipped through the catalog and upon seeing Khidekels from the Boulé collection, Hutton commented, "that is no good." Upon visiting Hutton in late 1995 in order to borrow works for the

Iowa exhibition, Railing was given a copy of the Repudiation Letter and was told by Hutton that she would only lend works to the exhibition if she could first see the complete list of works to be included. Hutton stated that she did not "want [her] works contaminated with fakes in an exhibition in which there are fakes." Railing understood Hutton to be commenting on the authenticity of the Boulés' collection.

(c) Statements by the Khidekel Defendants

Following her meeting with Hutton at the Hutton Galleries in late 1995, Railing visited Mark and Regina at their New York apartment. During this visit, the Khidekels told Railing that the Boulés' collection was "not by my father, they're fakes."

In its February 1996 issue, *ARTnews* published a 13–page article entitled, "The Betrayal of the Russian Avant Garde." The article reported on the prevalence of incorrectly attributed works and forgeries in Russian avant-garde art and discussed works by several artists, including Lazar Khidekel. Regina was quoted in the article as follows:

> When [Mark and Regina] finally saw the works, which belong to Paris collectors Claude and René Boulé, they were . . . puzzled. "I don't know whether they're fakes or works of somebody else," says Regina. "I only know and we are absolutely sure, that they have nothing to do with Khidekel."

In a February 23, 1996 article in the Montreal publication *Le Devoir*, Regina is quoted as saying, "I am categorical: these works are not by Khidekel." In the February 22–28, 1996 issue of the Montreal periodical *Voir*, Mark and Regina are quoted as saying that the works in the Boulés' collection are "not those of Khidekel." The *Voir* article also republished one of Regina's statements in the *ARTnews* article.

26. Mark and Regina also made statements in which they denied that they had initially endorsed the Boulés' Khidekel collection. In the *ARTnews* article, Mark and Regina are quoted as saying that upon initially seeing the Boulés' collection at the Boulés' Paris home, "they told the Boulés the works were not Khidekels." In the February 23, 1996 *Le Devoir* article, Regina is quoted as saying that "neither she nor her husband ever 'authenticated' anything and that fake certificates were forged."

27. After defendants' statements in *ARTnews* challenged the authenticity of the Boulés' collection, the Flaks withdrew their arrangement with the Boulés.

28. I found Claude Boulé to be a very credible witness. She was extremely forthcoming and responsive on cross-examination as well as direct examination. I accept her version of the facts as accurate and truthful.

29. Mark's testimony was guarded and evasive. When he denied signing the certificates of authenticity, his demeanor undermined the credibility of his "nyet." His inability to provide plausible explanations for much of his conduct reinforced the unreliability of his testimony. For example, Mark denied knowing that the Boulés' works would be included in the joint exhibition at Itinéraires, although the exhibition agreement, which Mark admitted that he had signed, includes explicit reference to the Boulés. Additionally, Serge Essaian testified that Mark and Regina had informed him that they were planning to participate in a joint exhibition with the Boulés and that Mark had even given the Boulés some historical documents about Lazar. Moreover, the comprehensive and persuasive testimony of Andrew Sulner, a

handwriting expert, and the striking similarity between the signatures on 15 of these certificates and the undisputed signatures of Mark Khidekel, are clear and convincing evidence that Mark Khidekel lied under oath when he testified that he did not sign the certificates of authenticity.

## DISCUSSION

### Lanham Act and Related Claims

 In order to be successful on their claims under the Lanham Act[3] and the New York General Business Law[4] and for product disparagement[5] and unfair competition,[6] plaintiffs bear the burden of proving by a preponderance of the credible evidence that defendants' statements were false. In this context, proving the "falsity" of defendants' statements impugning the authenticity of the Boulés' Khidekel collection, requires plaintiffs to prove that their works were in fact created by Lazar Khidekel. However, the evidence concerning authenticity is in equipoise, and thus, plaintiffs did not sustain their burden of proving the essential element of falsity by a preponderance of the evidence.[7]

### Evidence of Authenticity

### Initial Endorsement of the Boulé Collection

Plaintiffs place special importance on the certificates of authenticity that Mark wrote and signed on June 11, 1991. They also point to the cordiality of the various meetings between the Boulés and the Khidekels at the Boulés' Paris home, including Mark's gifts of a photograph of Lazar and a ceramic vase. Mark's execution of the Itinéraires contract in 1989 indicated his approval of a joint exhibition of his Khidekel works with works from the Boulés' collection. Moreover, plaintiffs presented evidence that until at least mid-May 1992, Mark and Regina intended to attend and lecture on Khidekel at the Joliette exhibition in Canada at which the Boulés works were to be shown.

3. In order to sustain a claim under Section 43(a) of the Lanham Act, plaintiffs must prove, among other elements, that the defendants made false representations about their own or plaintiffs' goods. *Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 823 (S.D.N.Y.1992).

4. In order to sustain a claim under the New York General Business Law § 349, plaintiffs must prove, among other elements, that defendants engaged in an act or practice which was deceptive or misleading. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). In order to sustain an action under the New York General Business Law § 350, plaintiffs must prove, among other elements, that defendants engaged in false advertising in business, trade or commerce. *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999).

5. In order to sustain a claim for product disparagement, plaintiffs must show, among other elements, that the defendants uttered a false statement of fact about the plaintiffs' products. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F.Supp.2d 235, 239 (S.D.N.Y.1999).

6. In order to sustain an action for unfair competition by disparagement, plaintiffs must prove, among other things, that defendants published a false statement. *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 142 (S.D.N.Y.1991).

7. There may be independent reasons for not allowing some of these statements to serve as the basis for these claims. For example, it is not clear that the New York General Business Law can be applied to the type of injury that plaintiffs suffered in this case. *See Oswego Laborers' Local 214*, 85 N.Y.2d at 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (noting that these statutes are "directed at wrongs against the consuming public" and that plaintiffs "must charge conduct of the defendant that is consumer-oriented").

Plaintiffs have shown by clear and convincing evidence that in the early 1990's, Mark and Regina endorsed the authenticity of the Boulés' Khidekel collection, and that Mark signed at least 15 certificates of authenticity for works in that collection. However, Mark's signatures on the certificates of authenticity do not prove authenticity by a preponderance of the evidence. First, there is no evidence that Mark had ever seen any of the Boulés' works before he saw them at the Boulés' home. Although neither Mark nor Regina questioned the authenticity of the works in the presence of the plaintiffs, Mark and Regina told the Boulés that the works by Lazar Khidekel that they inherited were "different" from those that the Boulés owned. Regrettably, because of their willingness to lie under oath in court when they denied that Mark had signed the certificates of authenticity, Mark and Regina's representations do not carry an assurance of truth. Mark's lack of credibility diminishes the weight of his certificates.

**Expert Witnesses**

Plaintiffs presented a distinguished art historian, Jean–Claude Marcadé, as an expert on the authenticity of the Boulés' Khidekels. Marcadé testified that the Boulés' Khidekel collection possessed characteristics and elements that were consistent with, and adhered to, Suprematist teachings and ideals. In particular, Marcadé testified that the Boulé collection exhibited the so-called "object-free" representations espoused by Malevich—elements of terrestrial attraction, gravity, dispersion and planetary movement. Additionally, Marcadé noted that the Boulé collection possessed the "common plastic vocabulary of Suprematism," including variations on themes using "the square, the circle, the cross, the triangle and their developments."

Marcadé also testified that the Boulés' Khidekels and the Khidekels of Mark and Regina shared attributes that were unique to Lazar Khidekel. For example, photographs seven through ten in the Hutton catalog and Figures 64 and 66 in the Joliette catalog provide examples of "Linear Suprematism" in which the artist depicted a human figure using Suprematist shapes. Marcadé explained that all of these works represent the same idea in the construction of a figure or character with Suprematist elements and show "a person[al] interpretation of Suprematism" that is peculiar to Lazar Khidekel. Marcadé also noted that both collections contain works created on old, browning paper, and in each collection, there is a range of different styles in which the artist signed his name.

Defendants countered Marcadé's testimony with the testimony of Alexandra Shatskikh. Shatskikh testified that the works in the Boulés' collection did not follow the Suprematist teachings of Malevich. For example, Shatskikh testified that many of the works in the Boulé collection used combinations of garish colors that were not used by Suprematist artists and were fundamentally inconsistent with basic principles of Suprematism. Additionally, Shatskikh noted that some of the works in the Boulé collection were on a type of paper that was different from the paper used by other Suprematist artists. Shatskikh also testified that it was very unusual for Suprematist artists, including Khidekel, to sign their works in a color that matched the work, because such a signature changes the composition and perspective of the work as a whole. Before the filing of this action, Shstskikh had never seen a work by Lazar Khidekel although as a student and researcher during Khidekel's lifetime, she had visited the apartments and viewed the work of many other artists in St. Petersburg where Khidekel lived for more that 50 years.

Shatskikh's testimony did not undermine the credibility or plausibility of Marcadé's analysis. However, Marcadé's conclusions regarding authenticity rested heavily on the certificates signed by Mark. Marcadé was an extremely credible witness. He admitted that the certificates were a "capital element, a main element" of his conclusion that the works were authentic. Marcadé testified that, in reaching his opinion, he relied on the language contained in the certificates signed by the artist's son that the works in the Boulé collection were student works of Lazar Khidekel. Although there is clear and convincing evidence that Mark did sign the certificates, Mark's lack of credibility diminishes the weight of his certificates on the issue of authenticity. Moreover, Mark was born in 1946, long after his father's student days. Marcadé had seen some works of Khidekel at the Leningrad home of Anna Leporskaia, one of Malevich's assistants, in the 1970's. But, Marcadé testified candidly that throughout the 1970's, Khidekel was "just a name," and Khidekel's name had not even appeared among other Suprematists until 1978.

**Technical Experts**

Samuel Palenik, an analytical forensic microscopist, testified on behalf of plaintiffs, and stated that he did not detect any anachronistic elements in the paper or ink used in the Boulés' Khidekel collection. Palenik's conclusions were based on energy dispersive x-ray ("EDS") analysis which helped him to determine the identity of the chemical elements present in the samples tested. Defendants countered with the testimony of Eugena Ordonez, an art conservator, who also analyzed the samples using EDS. Although Ordonez did not disagree with Palenik's conclusion that there were no anachronistic elements in the paper used in the Boulé collection, she did identify two possibly anachronistic ele-

ments in the inks. According to Ordonez, blue pigment from one of the watercolors contained titanium dioxide in an anatase crystal form, a pigment that Ordonez testified was not introduced into artists' pigments until 1925 in France and the 1930's in other European countries. Yellow pigment from three of the Boulés' works tested by Palenik contained Hansa Yellow, a pigment which, according to Ordonez, was not widely available as an artists' pigment until the 1930's or 1940's.

Palenik disagreed with Ordonez's detection of synthetic anatase and testified that Ordonez misidentified barium as titanium in her EDS analysis. Palenik pointed out that in an EDS analysis in which both barium and titanium are present, barium peaks overlap the titanium peaks, and thus, mask the presence of the titanium. Ordonez conceded that barium was present in virtually all of the samples. However, Ordonez defended her detection of titanium. She testified that she did not note the barium in her analysis, because she did not think that the presence of barium was relevant to her inquiry.

Furthermore, although Ordonez testified that Hansa Yellows were not widely available until the 1930's and 1940's, Ordonez did admit that Hansa Yellows had been written about in artists' books as early as 1925. A pigment that was written about in 1925 was probably available and used prior to that date.

In sum, the evidence of the authenticity of the Boulés' collection is in equipoise. The Boulés purchased 176 works on paper for cash from Vladmir Tsarenkov, an individual who had initially required the Boulés not to disclose his identity. Plaintiffs have been unable to proffer any further evidence concerning the source or history of their works. Indeed, Hutton testified credibly that as a dealer, she would not buy any art from Tsarenkov for

that reason. The absence of any provenance does not support authenticity.

For the foregoing reasons, plaintiffs have been unable to satisfy their burden of proving by a preponderance of the evidence the falsity of defendants' statements that the Boulé collection was not the work of Lazar Khidekel. Although it has not been shown that plaintiffs' collection is not the authentic work of Lazar Khidekel, burden of proof is dispositive in this case. Since falsity is an essential element of plaintiffs' Lanham Act, New York General Business Law, product disparagement and unfair competition claims, plaintiffs have not carried their burden on those claims.

**Defamation**

 Plaintiffs also claim that defendants' various statements were defamatory. To recover on a claim of libel, plaintiffs must prove the following elements by a preponderance of the evidence: (1) defendants made a defamatory statement of fact concerning the plaintiffs; (2) written publication to a third party; (3) fault; and (4) per se actionability or special damages. *Celle v. Filipino Reporter Enterprises, Inc.,* 209 F.3d 163, 176 (2d Cir.2000). A claim of slander requires proof of the same elements as those required for libel except slander refers to oral statements, not written ones. *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61–62 (2d Cir.1993). The statute of limitations for defamation is one year. N.Y.CPLR § 215(3) (McKinney 1990).

Defamatory Statements

 As the Second Circuit has noted "the gravaman of an action alleging defamation is an injury to reputation ... defined ... as one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induces an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Celle,* 209 F.3d at 177 (citations omitted). Additionally, "challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing." *Id.* at 177 (internal quotations omitted); *see also Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825 (1995) (courts "must give the disputed language a fair reading in the context of the publication as a whole"). Furthermore, "the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. It is the meaning reasonably attributable to the intended reader that controls." *Celle,* 209 F.3d at 177 (citations omitted).

 Each of the statements set out above in which defendants impugned the authenticity of the Boulés' Khidekel collection, when construed in the context in which those statements were made, were defamatory. Those statements, published to the art community and newspaper reporters, imply that the Boulés purchased, exhibited and offered to sell fraudulent works of art; these statements are not only injurious to the Boulés' art collection, but injure the reputation of the Boulés.

In addition to the statements denying the authenticity of the Boulés' collection, the Khidekel defendants' two additional statements in *ARTnews* and *Le Devoir,* in which the Khidekels denied that they initially endorsed the Boulés' collection and denied that Mark signed certificates of authenticity, are defamatory.

 Mark and Regina are quoted in the *ARTnews* article as having said that upon initially seeing the Boulés' collection

at the Boulés' Paris home, "they told the Boulés the works were not Khidekels." Mark and Regina concede that the quotation is accurate. The next sentence of the article reads, "the Boulés now dispute this, insisting that Mark and Regina first approved the works." When the Khidekels' statement is read in the context of the sentence following immediately, which describes the Boulés' position, it is reasonably understood that the Khidekels are stating that the Boulés continue to exhibit and deal in forged artwork, despite having been informed by the artist's son that his father did not create the works in their collection.

In the February 23, 1996 *Le Devoir* article, Regina is quoted as saying that "neither she nor her husband ever 'authenticated' anything and that fake certificates were forged." In light of the fact that this statement was made in the context of a discussion about the Boulés' Canadian exhibition, and that the article included specific reference to René Boulé's claim that he possessed certificates of authenticity signed by Mark, this statement is also defamatory. This statement is reasonably understood as stating that the Boulés possessed, and publicly referred to, in conjunction with the exhibition of their collection, certificates of authenticity that were forged.

### Falsity

If a statement involves a matter of public concern, a plaintiff suing for defamation bears the burden of proving the "falsity" of the defamatory statement. *Flamm v. American Association of Univ. Women*, 201 F.3d 144, 149–50 (2d Cir. 2000). The Second Circuit has explained that whether a given statement addresses a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the

whole record." *Id.* at 150 (citing *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In the context of this case, statements questioning the authenticity of the Boulés' collection are a matter of public concern. The Boulés' collection was displayed at public exhibitions, museums, and art shows throughout the world and portions of the collection were offered for sale to the public. *See* 1 Robert D. Sack, *Sack on Defamation*, § 4.4.4 (3d ed.2000) (the common law recognizes that publications commenting on "persons who present ... their services or goods to the public" are matters of public concern). In a similar case involving the American stained glass artist John La Farge, Judge Sweet noted "[g]ranted, the topic of La Farge may not be of interest to the population as a whole. Where, however, as here, the statements of [defendant] on the authenticity ... of works attributed to La Farge affect the market for ... La Farge's works among the segment of the population that trades such works as well as the community of scholars with an interest in La Farge, such statements are of public import." *McNally v. Yarnall*, 764 F.Supp. 838, 847 (S.D.N.Y.1991).

Plaintiffs have been unable to prove the authenticity of their collection by a preponderance of the evidence, and, therefore, unable to prove the falsity of each statement denying the authenticity of the Boulés' collection. But, plaintiffs have proved by a preponderance of the credible evidence the falsity of the statements in *ARTnews* by Mark and Regina that they had initially informed the Boulés that the works were not authentic, and in *Le Devoir*, in which Regina denied that Mark ever wrote certificates of authenticity.

### Fault

A public figure who sues for defamation must show that the allegedly

defamatory material was published with "actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A defamation plaintiff who is not a public figure bears a lighter burden of proof of fault. If the allegedly defamatory statement involved a matter of public concern, a private plaintiff is required to prove that the defendant was "grossly irresponsible" in making the statement; if the statement did not involve a public matter, a private plaintiff merely needs to prove that the defendant acted negligently in making the statement. *See Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (matters of public concern); *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 674 N.Y.S.2d 662, 665 (1st Dep't 1998) (requiring negligence if not a matter of public concern). The parties dispute whether the Boulés should be treated as limited public figures, for the purposes of this litigation.[8]

Regardless of which standard of fault is applied in this case, plaintiffs have satisfied their burden of proving fault. It is clear that Mark and Regina knew that their false and defamatory statements in *ARTnews* and *Le Devoir* were false at the time the statements were made. Mark and Regina knew that they had not told the Boulés that their collection was inauthentic, and they each knew that Mark had signed certificates of authenticity for the Boulés.

*Per Se Actionability or Special Damages*

 Under New York law, a plaintiff who sues for libel must plead and prove special damages unless the defamatory statement falls into one of the categories of libel per se. *Celle*, 209 F.3d at 179 ("New York recognizes certain statements as defamatory per se, meaning they are actionable without 'pleading and proof of special damages.'") (citing *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir.1985)). If a statement is defamatory per se, injury is assumed, and "even where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages." *Id.* (citations omitted).

 "Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998, 999 (2d Dep't 1984); *see also Sack on Defamation*, supra, § 2.8.7.1 ("Special damages refers only to pecuniary damages such as out-of-pocket loss."). The Boulés have not proven special damages resulting from the two false and defamatory statements in *ARTnews* and *Le Devoir*. Those statements relate to the Boulés' persistence in displaying works that they had been told were inauthentic; the injury was to the Boulés' reputations—not out-of-pocket loss. Any diminution in the market value of the Boulés' Khidekel collection is more likely to have been caused by defendants' statements that the Boulés' collection was not authentic,[9] than to the Boulés' persistence

---

8. A plaintiff may be considered a limited public figure for a specific litigation if the defendant has shown that the plaintiff has
(1) successfully invited public attention to his views in an effort to influence other[s] prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of litigation; (3) assumed a position of

prominence in the public controversy; and (4) maintained regular and continuing access to the media.
*Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir.1984).

9. As noted, these statements are not actionable because plaintiffs have failed to satisfy their burden to prove their falsity.

in displaying inauthentic works.[10] Thus, in order to succeed on their libel claim, plaintiffs were required to prove that defendants' statements constituted libel per se.

"The line between statements that are defamatory per se and those that require proof of special damages remains fuzzy." *Celle*, 209 F.3d at 179; *see also Sack on Defamation*, supra, § 2.8.6.4 (area of law "remains in disarray"). "One useful general rule is that a writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." *Celle*, 209 F.3d at 179; *see also Davis*, 754 F.2d at 82 ("words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonest, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed. 1984) ("[I]t is actionable without proof of damage to say of a physician that he is a butcher . . ., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes . . . since these things discredit [one] in his chosen calling.").

■ René and Claude Boulé are not professional art dealers. They are collectors who decided to sell a portion of their collection. (Flak Dep., 7) ("I should say they are both connoisseurs and amateurs of [Russian] art. And I would say that they are first and foremost connoisseurs."). Although René had a master's degree in art history, he was a dental surgeon by profession. Thus, it cannot be said that the Boulés, as a couple, or René personally, suffered sufficient harm to professional reputation to warrant a finding of libel per se.

■ However, Claude was an art historian and a lecturer and writer in the field of Russian avant-garde art. She has participated· in conferences and seminars on Russian avant-garde art and has published articles on Russian avant-garde art as well as an authoritative book on Russian Constructivism, entitled "Russian Constructivism, Typographies and Photomontages."[11] Statements which imply that Claude continued to allow her collection of works to be displayed despite having been informed by the artist's son that the works were not authentic is presumed to injure Claude's professional reputation for integrity, provided that readers of the statements knew that Claude was a respected art historian.

■ It is well established in New York that statements cannot be libelous per se "if reference to extrinsic facts is necessary to give them a defamatory import." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985). However, if the extrinsic information was "presumably known" to the readers of the statement, the statement may still be considered libelous per se. *See Lian v. Sedgwick James of New York, Inc.*, 992 F.Supp. 644, 650–51 (S.D.N.Y. 1998); *Van–Go Transport Co., Inc. v. New York City Bd. of Ed.*, 971 F.Supp. 90, 98–99 (E.D.N.Y.1997); *Alvarado v. K–III Magazine Corp.*, 203 A.D.2d 135, 610

---

**10.** There is no evidence that the Flaks read any of defendants' statements other than those in *ARTnews*.

**11.** Constructivism and Suprematism are branches of Russian Futurism.

N.Y.S.2d 241, 243 (1st Dep't 1994). Readers of an article concerning fake Russian avant-garde works that was printed in *ARTnews*, an internationally recognized publication read by gallery owners, dealers, art historians and collectors, would have known of Claude's profession. But, plaintiffs have offered no evidence that a reasonable reader of *Le Devoir*, a daily newspaper that reports all kinds of news, would have known about Claude's profession. Thus, only Claude Boulé has proved libel per se, and only with respect to the false and defamatory statement contained in the *ARTnews* article.

### Damages

Although injury to Claude's professional reputation is presumed, plaintiffs presented very little evidence that Claude suffered actual harm to her professional reputation as a result of defendants' statements in the *ARTnews* article. Plaintiffs have not shown that Claude has been ostracized or rejected from the Russian avant-garde art community of scholars or that she has been unable to take advantage of other professional opportunities in the Russian avant-garde art world. Although plaintiffs have failed to prove that Claude suffered actual damages from the libel per se, she is entitled to nominal damages. *See Celle*, 209 F.3d at 172.

Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel. *Celle*, 209 F.3d at 184; *Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993). "Plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of hatred, ill will, [or] spite." *Celle*, 209 F.3d at 184. Plaintiffs have not produced any evidence demonstrating that the Khidekels

acted out of hatred or ill will when they made their defamatory statements; avarice is not the equivalent of spite. Accordingly, Claude is not entitled to punitive damages.

### Breach of Contract

Plaintiffs argue that Mark Khidekel breached the contract to furnish certificates of authenticity to the Boulés when he repudiated the authenticity of the Boulés' collection. A preponderance of the credible evidence establishes that Mark entered into a contract to write 16 certificates of authenticity in exchange for 40,000 FF in June 1991.

None of the parties has provided any authority for interpreting the contract between the Boulés and Mark Khidekel under French law. Although defendants did note in the joint pretrial order that the breach of contract issue involved "issues of choice of law and French law," all cases cited by defendants on the issue of breach of contract are New York cases, and defendants have not argued that there is any distinction between New York law and French law on the issue of breach of contract. In such a situation, the Restatement (Second) of Conflict of Laws calls for the application of the law of the forum: "[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interest of justice." Restatement (Second) of Conflict of Laws, § 136, cmt. h, at 378–79 (1971); *Nacional Financiera, S.N.C. v. Americom Airlease, Inc.*, 803 F.Supp. 886, 893 (S.D.N.Y.1992). *See also Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 23 n. 5 (2d Cir.1974) (citing the Restatement's provision with approval). Accordingly, I apply New York law to

the contract between the Boulés and Mark Khidekel for the 16 certificates of authenticity.

Plaintiffs argue that the contract imposed an obligation on Mark to continue to stand behind his certificates. Although the contract did not contemplate any additional performance by Mark, implicit in the contract was a covenant by Mark not to repudiate his opinion in bad faith without reimbursing the Boulés. A contract to pay an individual for a signed opinion does not permit the signer to disavow the substance of that opinion and subvert the entire purpose of the contract without any justification. In 1996, Mark's statements to *ARTnews* repudiated the substance of the 16 certificates that he signed on June 11, 1991. There is no evidence that in the period between June 1991 and February 1996 Mark had suddenly discovered new information about his father's works. Mark's subsequent statements of repudiation were made in bad faith and constituted a breach of contract.

Ordinarily, courts apply the doctrine of expectation damages to a breach of contract claim in order to place the aggrieved parties in the same economic position as they would have been in if both sides had fully performed the contract. *See Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 728–29 (2d Cir.1992). The benefit of the bargain, or expectation damages, for breach of the contract for the certificates should be measured by the difference between the value of the certified works before the certificates were signed and the amount by which the certificates of authenticity enhanced the value of those works. But, plaintiffs have not presented sufficient evidence of the difference in the value of the certified works before and

after the certificates were signed by Mark. It has not been shown that there was a market in France for drawings of Lazar Khidekel even before the certificates were repudiated. The fact that during the five years before trial, a leading Russian avant-garde gallery in New York was able to sell four works from Mark and Regina's entire collection does not show that the Boulés' collection was marketable in Europe. There was no evidence at trial that the Hutton Galleries had been able to sell a single Khidekel at the FIAC in Paris in October 1994, although it offered Khidekels for sale there. Additionally, the only effort to sell the Boulés' works, at the Art Messe in Frankfurt in 1995, was unsuccessful. While Claude testified that the Flaks agreed to purchase at least 50 works from the Boulés' collection in several installments over a number of years, Edith Flak's testimony concerning the unsettled details of that agreement, such as the precise number of works to be purchased and whether payment would be made in the event that they were unable to sell the works, makes the agreement sound more like the usual consignment, as distinguishable from an outright purchase. Flak testified that she was seeking to develop a market in Paris for Russian avant-garde art, and that none existed prior to the time she testified in 1998. Moreover, the Boulés were not merchants and there is no evidence that their collection was originally purchased for resale.

Plaintiffs have also not shown that they incurred any damages as a result of relying on Mark's performance of his contractual duties.[12] *See Bausch & Lomb* 977 F.2d at 729. Accordingly, plaintiffs' only basis for recovery is restitution. Under

---

**12.** Under the doctrine of reliance damages, "a plaintiff may recover his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." *Bausch & Lomb,* 977 F.2d at 729.

the theory of restitution damages as an alternative remedy for breach of contract, plaintiff is entitled to recoup the value of the benefit that it has conferred on the breaching party. *Id.* at 729–30; Restatement (Second) of Contracts, § 344, at 102–03 (1979). Accordingly, plaintiffs are entitled to recover the $7,089.56 that they paid to Mark Khidekel for the certificates (40,-000 FF at 5.6421 FF per $1), plus pre-judgment interest from February 1996.

## Unjust Enrichment

Plaintiffs argue that defendants have been unjustly enriched by their conduct. The Second Circuit has recently reiterated the elements of an unjust enrichment claim:

> To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that "equity and good conscience" require restitution. The "essence" of such a claim "is that one party has received money or a benefit at the expense of another."

*Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citations omitted).

▇▇▇ The money that Mark Khidekel received at the expense of the plaintiffs was the 40,000 FF for the certificates of authenticity. A claim for unjust enrichment cannot be predicated on conduct that is governed by a contractual relationship between the parties. *Maryland Casualty Co. v. W.R. Grace and Co.,* 218 F.3d 204, 212 (2d Cir.2000) ("The notion of unjust enrichment applies where there is no contract between the parties."); *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir.1997) (noting that claims for unjust enrichment are "inapplicable if there is an enforceable contract governing the subject matter"); Restatement of Restitution, § 107(1), at 447–48 (1937). Because a covenant of good faith is implied in every contract, if a contract exists, the equitable remedy for unjust enrichment is not needed.

## Additional Claims

▇▇▇ Plaintiffs have asserted a number of additional claims, none of which has any merit. Plaintiffs claim that Mark and Regina's initial representations that the Boulés' collection contained authentic Khidekels constituted common law fraud. For common law fraud, plaintiffs must demonstrate that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. *Mirabadi v. Nurbakhsh,* 1995 WL 564174, at *4 (S.D.N.Y. Sept. 22, 1995). It has not been shown that the Boulés' collection is not authentic, and thus, it has not been shown that Mark Khidekel made a false representation when he certified the Boulés' collection.

▇▇▇ Plaintiffs also claim that defendants' conduct constituted tortious interference with the Boulés' existing and prospective business relationships with Patricia Railing and the Flaks. Tortious interference with business relations requires: (1) the existence of a business relationship between the plaintiff and a third party; (2) knowledge of that relationship and intentional interference with it by the defendant; (3) for the sole purpose of harming the plaintiff, or by use of dishonest, unfair, or improper means; and (4) injury to the relationship.[13]

---

**13.** The same basic elements apply to tortious interference with contract as to tortious interference with business relations (with the obvious difference that tortious interference with business relations does not require plaintiff to prove the existence of a contract). *See Union*

■ As to Railing, her relationship to plaintiffs was not a *business* relationship. She was attempting to organize an exhibition at the University of Iowa Museum of Art—this was not an exhibition for the purpose of selling any works. Moreover, Railing testified that she was not influenced by the defendants' statements. As to the Flaks, there is no evidence that any of the defendants knew of the Boulés' agreement with the Flak Gallery at the time the statements were made.

Plaintiffs also have claimed that defendants' statements questioning the authenticity of the Boulés' Khidekel collection constituted a prima facie tort. But there is no evidence that defendants' statements were motivated solely by "disinterested malevolence," as distinguishable from economic self-interest. *See Twin Labs., Inc. v. Weider Health and Fitness,* 900 F.2d 566, 571 (2d Cir.1990) ("plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm.")

■ As to the tort of "false light," New York does not recognize such a tort. *Howell v. New York Post Co. Inc.,* 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).

## CONCLUSION

For the foregoing reasons, plaintiffs have failed to prove by a preponderance of the evidence their claims under the Lanham Act and the New York General Business Law. They have also failed to prove product disparagement, unfair competition,

*Carbide Corp. v. Montell N.V.,* 944 F.Supp.

slander, unjust enrichment, fraud, tortious interference with business relations, prima facie tort, and false light. Plaintiffs have succeeded on their breach of contract claim against Mark Khidekel and have proved restitution damages of $7,089.56. Additionally, Claude has succeeded on one libel per se claim against Mark and one libel per se claim against Regina. For each of those libel claims, nominal damages of ten dollars is awarded.

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk of the Court shall enter judgment for both plaintiffs jointly and against Mark Khidekel in the amount of $7,089.56 plus interest from February 1996, together with the costs of this action. In addition, the Clerk shall enter judgment for Claude Boulé against Mark Khidekel in the amount of $10 and for Claude Boulé against Regina Khidekel in the amount of $10. The claims against Ingrid Hutton and the Leonard Hutton Galleries, Inc. are hereby dismissed.

SO ORDERED.

1119, 1136–37 (S.D.N.Y.1996).