**Rene BOULE, Claude Boule,
Plaintiffs–Appellants,**

**v.**

**Ingrid HUTTON, Leonard Hutton Galleries, Inc., Mark Khidekel, Regina Khidekel, Defendants–Appellees,**

**Docket Nos. 01–7501, 01–9384.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 5, 2002.

Decided: April 24, 2003.

Gerald A. Rosenberg (Stacey B. Creem and David B. Powers, on the brief), Katten, Muchin, Zavis & Rosenman, New York, NY, for Plaintiffs–Appellants.

Martin R. Gold, (Robert P. Mulvey, on the brief), RubinBaum LLP, New York, NY, for Defendants–Appellees Ingrid Hutton and Leonard Hutton Galleries, Inc.

Anastasios Sarikas, Astoria, NY, for Defendants–Appellees Mark Khidekel and Regina Khidekel.

Before: CALABRESI, B.D. PARKER, Circuit Judges, and COTE, District Judge *.

Judge CALABRESI joins the opinion and concurs in a separate opinion.

COTE, District Judge.

Plaintiffs-appellants René and Claude Boulé ("the Boulés") appeal from the decisions of the district court (1) granting partial summary judgment to defendants-appellees Ingrid Hutton ("Hutton"), the Leonard Hutton Galleries, Inc. ("the Gallery"), Mark Khidekel ("Mark") and Regina Khidekel ("Regina"), (2) finding for defendants on certain of plaintiffs' claims after a bench trial, and (3) denying plaintiffs' motion for relief from judgment under Fed.R.Civ.P. 60(b). For the reasons set forth below, we affirm in part, and vacate in part the decisions of the district court.

At its heart, this is a dispute about the authenticity of works of art (the "Paintings") owned by the Boulés. While the Boulés believe the Paintings to be early works of the Russian Suprematist artist Lazar Khidekel ("Lazar"), Lazar's son Mark and daughter-in-law Regina (collectively, "Khidekels") claim that they are not. The Khidekels are selling their own collection of Lazar's art through Hutton and her Gallery.

The Boulés brought suit under the Lanham Act and state law causes of action to recover for the damage to the value of the Paintings that they assert occurred because of statements made by the defendants. The Honorable Miriam Goldman Cedarbaum held, *inter alia*, that the Boulés had not carried their burden of showing that the Paintings were authentic,

* The Honorable Denise Cote of the United States District Court for the Southern District of New York sitting by designation.

that is, painted by Lazar. On the other hand, she found that the Khidekels had falsely and in bad faith denied that Mark had given the Boulés certificates acknowledging that at least some of the Paintings were indeed his father's. Applying the special damage rules that pertain to the law of defamation, the district court awarded the Boulés nominal damages. Each of these rulings and others entered by Judge Cedarbaum in her three opinions have been challenged on appeal.

## BACKGROUND

Lazar was born in 1904 in Vitebsk, Russia, and joined the Suprematist school of Russian avant-garde artists in the years following the Russian Revolution. In his youth, Lazar studied with two of the better-known artists of the period, Marc Chagall and Kazmir Malevich, and later in life became a prominent architect. The artworks in his possession upon his death in 1986 became the property of Mark and Regina.

The Boulés are Parisian art collectors who own a number of works from the Russian avant-garde period; in addition, Claude has published a scholarly work on Russian Constructivism. By the late 1980s, the Boulés had acquired 176 works attributed to Lazar. As it was both illegal and dangerous to acquire Russian avant-garde art prior to the fall of the Soviet Union, the majority of the Boulé's pieces were acquired through non-traditional channels.

The Boulés and the Khidekels first encountered each other in Paris in 1988. Over the next few years, the Khidekels and the Boulés developed a friendship, as the Khidekels were pleased to find admirers of Lazar's work in the West, and the Boulés were happy to show their collection to them. They made (ultimately unrealized) plans to pool their collections of Lazar's work for an exhibition in Canada, and, in 1991, in exchange for approximately $8,000, Mark signed certificates of authenticity in Paris for sixteen of the Paintings he selected from the Boulés' collection. The certificates stated: "I, Mark Khidekel, having examined the artwork shown to me ... hereby confirm that it is the work of my father, Lazar Khidekel, and that it can be identified as a study." *Boulé v. Hutton,* 138 F.Supp.2d 491, 498 (S.D.N.Y.2001).

During this period, although the Khidekels were surprised that a collection of Lazar's work existed in Paris, and told the Boulés that some of the pieces they owned were different from those of Lazar's works that the Khidekels possessed, Mark and Regina never expressed to the Boulés any reservations about the legitimacy of the collection. As the district court found at trial, "Mark noted some differences between the Boulés' collection and his collection, and commented that the bulk of the Boulés' collection was created when Lazar Khidekel was a very young student—possibly as early as 1920." *Id.*

The Boulés exhibited the Paintings at the Joliette Museum of Art in Montreal, Canada in 1992, and galleries in Canada over the course of the months that followed. Although Mark expressed an interest in lecturing at the Joliette Museum in conjunction with the exhibition of the Paintings, the Khidekels ultimately did not participate.

The Khidekels began an association with Hutton in 1992, and moved to New York in 1993. Hutton is a prominent dealer of art of the Russian avant-garde, which has a small but global market. *Boulé v. Hutton,* 70 F.Supp.2d 378, 388 (S.D.N.Y.1999). The Khidekels soon entered into a consignment agreement with Hutton to facilitate the sale of their collection of Lazar's work.

In 1995, the Gallery exhibited works from the Khidekel's collection. The exhibition catalogue noted that it represented the first-ever display of Lazar's work, despite the earlier show at the Joliette Museum in Canada that had included works from the Boulés' collection.[1] In late 1995 and early 1996, the Khidekels and Hutton sent a jointly-signed letter to at least twenty-five art galleries around the world (the "Repudiation Letter"), repudiating the Paintings that had been loaned by the Boulés and attributed to Lazar in the Canadian exhibition.[2]

In 1996, after being approached by a reporter, Hutton arranged for the Khidekels to be interviewed for an article in *ARTnews*, a leading industry publication, entitled "The Betrayal of the Russian Avant–Garde." The article discussed the entry of "thousands" of fraudulent artworks into galleries, museums and private collections. The Khidekels were quoted in the article as stating that the Paintings were not Lazar's work, and as so advising the Boulés when they had initially viewed the Boulés' collection.[3] An article that appeared shortly thereafter in *Le Devoir*, a Montreal publication, contained a quotation from Regina specifically denying that she or Mark had ever authenticated any portion of the Boulés' collection.[4]

The Boulés brought suit in 1997, alleging that defendants' statements in the Gallery catalogue, the Repudiation Letter, *ARTnews*, and in *Le Devoir*, and other statements to art dealers and journalists violated the Lanham Act. They further

1. The catalogue for the 1995 show at the Gallery contained the following statement: "We present for the first time anywhere the work of Lazar Markovich Khidekel.... In his lifetime [Lazar Khidekel] never had a solo show, nor did he or his family ever sell or part with any of his works." *Boulé*, 138 F.Supp.2d at 499.

2. The Repudiation Letter read as follows:

This is to inform you that we, the undersigned, Mark Khidekel and Regina Khidekel, the heirs of Lazar Markovich Khidekel, and Ingrid Hutton, completely repudiate the catalogue of the exhibition of works by Lazar Markovich Khidekel published by the Musee d'art de Joliette, Quebec, Canada in 1992. We will not permit this catalogue to be cited in connection with any works by Lazar Markovich Khidekel coming from the Khidekel Family or from the Leonard Hutton Galleries nor should this catalogue be cited by any other person or institution as reference material or in any other way in connection with works by Khidekel coming from the Khidekel Family or Leonard Hutton Galleries.

*Boulé*, 138 F.Supp.2d at 499.

3. The *ARTnews* article contained the following passages:

[Lazar] never had a solo show during his lifetime, nor did he or his family ever sell or part with any of his works, according to his son and daughter-in-law, Mark and Regina Khidekel. On this point, they were adamant....

But when they finally saw the works, which belong to Paris collectors Claude and René Boulé, they were even more puzzled. "I don't know whether they're fakes or works of somebody else," says Regina. "I only know, and we are absolutely sure, that they have nothing to do with Khidekel."

They also wondered where so large a collection—about 200 works, primarily watercolors—that were unknown to them could have come from. The Boulés refused to tell them.

Mark and Regina say that they told the Boulés the works were not Khidekels.... What makes Mark and Regina most indignant is that the catalogue [for the Joliette Museum exhibition] gives the impression that they endorse the Boulé collection, which they most emphatically do not.

*Boulé*, 70 F.Supp.2d at 391, App. A (*quoting* "The Betrayal of the Russian Avant–Garde," *ARTnews*, Feb. 1996.)

4. In the February 23, 1996 *Le Devoir* article, Regina is quoted as saying that "neither she nor her husband ever 'authenticated' anything and the fake certificates were forged." *Boulé*, 138 F.Supp.2d at 500 (internal quotation omitted).

alleged that the statements violated the New York General Business Law, and state law causes of action against disparagement, defamation, tortious interference with business relationships, unfair competition, unjust enrichment and breach of contract.

## A. The summary judgment rulings

Defendants moved for summary judgment on many of the claims arising under the Lanham Act.[5] In a decision of October 12, 1999, the district court dismissed all of the Lanham Act claims addressed by the motion except for the claim based on the statements in the Gallery catalogue. *Boulé,* 70 F.Supp.2d at 390. The Boulés have appealed the dismissal of only two of their Lanham Act claims: the claims based on the statements in the Repudiation Letter and in *ARTnews.*

The district court found that the statements in the Repudiation Letter were not actionable because they could not be considered a "representation of fact" within the meaning of the Lanham Act. *Id.* at 388–89. The claim pertaining to the statements to *ARTnews* was dismissed because the district court held that a response to an unsolicited inquiry from a reporter on a topic of public concern—fraud in the Russian avant-garde art market—was not a statement made "in commercial advertising or promotion." *Id.* at 390.

## B. The trial

A bench trial on the remaining causes of action was held from September 27 through October 6, 2000. The district court found for the defendants on the remaining Lanham Act claim. The' district court ruled that to recover on the Lanham Act claim, the plaintiffs had to show that the statements in the Gallery catalogue

impugning the authenticity of the Boulés' Paintings were false statements and therefore that they bore the burden of showing that the Paintings were authentic. *Boulé,* 138 F.Supp.2d at 501. The district court found, however, that the evidence on authenticity was in equipoise. The inability of plaintiffs to prove the falsity of defendants' statements about the authenticity of the Paintings also led the court to dismiss their state law causes of action under the New York General Business Law, for disparagement, unfair competition and common law fraud. *Boulé,* 138 F.Supp.2d at 504, 510.

Judge Cedarbaum did find for plaintiffs on part of their defamation claim. The district court found that the statements published in *Le Devoir* to the effect that Mark had never signed the certificates of authenticity, and in *ARTnews* representing that Mark and Regina had told the Boulés that the Paintings were not authentic, were false and defamatory, 138 F.Supp.2d at 505–06, but that plaintiffs had not proved special damages. *Id.* at 506–07. The district court found, however, that the *ARTnews* statements constituted libel *per se* with regard to Claude Boulé in her capacity as an art historian, but declined to award any more than nominal damages. *Id.* at 507–08. The plaintiffs also received judgment on their breach of contract claim, as the district court found that Mark had breached the implied covenant of good faith and fair dealing by repudiating the certificates. On this basis, plaintiffs were awarded restitution, but not expectation damages. *Id.* at 508–10. The remaining state law causes of action were dismissed. *Id.* at 510–11.

## C. Rule 60(b) motion

Following trial, plaintiffs brought a motion for relief from judgment pursuant to

5. The summary judgment motion did not address the statements in *Le Devoir.*

Rule 60(b)(2), Fed.R.Civ.P., on the ground of newly discovered evidence. The district court denied this motion, finding that the new evidence the plaintiffs offered could have been discovered in time for trial and in any event would not have changed the outcome. *Boulé v. Hutton,* 170 F.Supp.2d 441 (S.D.N.Y.2001).

## DISCUSSION

### A. *Summary Judgment*

The Boulés appeal from the district court's grant of summary judgment on the Lanham Act claims based on the statements in *ARTnews* and the Repudiation Letter.[6] We review a grant of summary judgment *de novo. Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 90 (2d Cir.2002). "Summary judgment is appropriate where the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Lanham Act provides, in relevant part:

Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—[...]

(B) *in commercial advertising or promotion,* misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1) (emphasis supplied). The Lanham Act makes actionable "false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services." *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir.2001) (citation omitted).

#### i. Statements in *ARTnews*

■ Judge Cedarbaum granted summary judgment to the defendants on the Lanham Act claim addressed to the reported statements by Mark and Regina in an article about the prevalence of fraud in the market of Russian avant-garde art. Mark and Regina are described in the article as asserting that Lazar never sold or parted with any of his work, that they were "absolutely sure" that the Paintings "have nothing to do with Khidekel," that they each told the Boulés that the Paintings were "not Khidekels," and that they did not endorse the Boulés' collection, as the catalogue for the 1992 exhibition at the Joliette Museum in Canada implied.

■ This Court recently adopted a three-part test to determine whether statements constitute "commercial advertising or promotion", as that phrase is used in the Lanham Act. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 56–58 (2d Cir. 2002). The statement must be "(1) commercial speech; ... [ (2) ] for the purpose of influencing consumers to buy defendant's goods or services; and [ (3) ] although representations less formal than those made as part of a classic advertising campaign may suffice, they must be dis-

---

**6.** The defendants challenge the district court's conclusion in the summary judgment opinion that the Boulés have standing to bring an action under the Lanham Act. As the defendants have not filed a cross-appeal, we do not reach this argument.

seminated sufficiently to the relevant purchasing public." *Id.* at 56. This test adopts three of the four prongs first described by the Honorable Leonard B. Sand in *Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics,* 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994). We did not need to reach in *Fashion Boutique,* and we do not need to reach here, whether the fourth prong from *Gordon & Breach*—that the defendant and the plaintiff be competitors—is necessary to find commercial advertising and promotion. *See Fashion Boutique,* 314 F.3d at 58. If the requirement of competition were a necessary element, the Boulés offered sufficient evidence that Mark and Regina were their competitors in the sale of art attributed to Lazar to survive summary judgment.

The Boulés also offered sufficient evidence in opposition to the motion for summary judgment to raise questions of fact regarding two of the components of the *Fashion Boutique* test. First, they submitted evidence that Mark and Regina spoke as they did to *ARTnews* with the purpose of influencing consumers to buy their own collection of Lazar's paintings. The district court nonetheless held that the fact that Mark and Regina's statements were a response to "an unsolicited inquiry by a magazine reporter seeking comment on a topic of public concern" foreclosed recovery under Section 43(a), as the words of the statute "connote proactive, not merely reactive, communication." *Boulé,* 70 F.Supp.2d at 390 (citation omitted). As noted in *Fashion Boutique,* however, the proactive-reactive distinction employed by the district court is "instructive, but not necessarily dispositive" in determining whether a representation is designed to reach the public. *Fashion Boutique,* 314 F.3d at 57–58. The Boulés offered evidence sufficient to find that the Khidekels intended and expected that their statements to *ARTnews*

would be disseminated to virtually every important collector and dealer in Russian Suprematist art, and that the statements were part of their campaign to disparage the Boulés' Paintings. *Boulé,* 70 F.Supp.2d at 390 (citation omitted). Second, with their evidence about the prominence of *ARTnews* in the commercial art world, the Boulés also offered evidence that the *ARTnews* statements were disseminated sufficiently to the relevant consumers.

The remaining prong of the test for "commercial advertising or promotion" is whether the statement constitutes commercial speech. The district court concluded that there was strong evidence that the *ARTnews* statements damaged the commercial interests of the plaintiffs and promoted the commercial interests of the Khidekels. It concluded, however, that Section 43(a) "does not cover a response to an unsolicited inquiry by a magazine reporter seeking comment on a topic of public concern." *Boulé,* 70 F.Supp.2d at 390.

We have little hesitation in deciding that as a matter of law the *ARTnews* article, and the Khidekels' statements quoted in that article, are not commercial speech. The article itself addresses a matter of public concern—fraud in the art market—and is certainly protected. The Khidekels' statements contained in the article are inextricably intertwined with the reporters' coverage of their topic. The statements by the Khidekels in *ARTnews* contribute to reporters' discussion of an issue of public importance and occur in a forum that has traditionally been granted full protection under the First Amendment. As always with the public expression of opinion, "we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1052

(2d Cir.1995).[7] Consequently, the defendants were entitled to a grant of summary judgment on that portion of the Lanham Act claim that addressed the statements by the Khidekels in *ARTnews*.

ii. Statements in the Repudiation Letter

■ The summary judgment ruling regarding the Repudiation Letter requires little discussion. The district court held that the statements in the Repudiation Letter about the catalogue for the exhibition of the Paintings at the Joliette Museum in Canada were not actionable because the statements were not factual assertions about another's goods. A statement of opinion is not actionable under the Lanham Act if it "could not reasonably be seen as stating or implying provable facts" about a competitor's goods or services. *Groden*, 61 F.3d at 1051.

The Boulés argue that the statements in the Repudiation Letter would have been understood by the reader as factual assertions about the authenticity of the Boulé's collection displayed at the Canadian exhibition because of Hutton's reputation as a leading American expert on Suprematist art and the Khidekels' status as Lazar's relatives. While the Boulés did raise issues of material fact as to whether these statements would have been appreciated as representations of fact, we decline to remand, as the claim must still be decided for the defendants as a matter of law. Because we affirm the district court's finding that the evidence on authenticity was in equipoise, the plaintiffs are unable to establish that the statements in the Repudiation Letter are false and their Lanham Act claim with respect to the Repudiation Letter necessarily fails. We may affirm a judgment on any ground appearing in the record, even one on which the district court has not relied. *See ACEquip Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir.2003).

B. *The Trial*

The plaintiffs contend that the district court erred at trial principally in ruling that they bore the burden of proving that their Paintings were created by Lazar, in dismissing their claims under Section 349 of New York's General Business Law and the New York common law of unfair competition by disparagement, and in the calculation of damages. Each of these issues is addressed in turn.

i. Authenticity of the Paintings

■ The district court held that the burden to prove the falsity of the defendants' statements regarding the Paintings rested on the plaintiffs. The plaintiffs, therefore, had to prove that the Paintings were created by Lazar. Judge Cedarbaum determined that the evidence regarding the authenticity of the Boulés' collection was in equipoise and that the plaintiffs had failed to carry their burden and prove falsity. *Boulé*, 138 F.Supp.2d at 503–04.

We review the district court's findings of fact for clear error. *Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 26 (2d Cir.2002). Judge Cedarbaum's findings of fact evince a careful review of the extensive record and a mastery of complex facts; we can find no clear error in her findings on authenticity.

**7.** Although we have adopted the First Amendment's definition of "commercial speech" for the purposes our analysis of the Lanham Act claim, it is worth noting that noncommercial speech may, in appropriate cases, and pursuant to other causes of action, be actionable.

To give but one example, non-commercial libel and slander directed at private individuals may be the basis of state action where there is a showing of fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The district court gave limited weight to the certificates of authenticity that Mark had signed because of Mark's lack of credibility. Judge Cedarbaum found that he had lied under oath in court when he denied signing the certificates. Although she found the testimony given by the Boulés' French art historian more credible than that given by the Russian art historian upon whom the defendants relied, the value of the opinion by the French expert regarding authenticity was diminished by that expert's heavy reliance on the discredited certificates. The competing technical experts agreed that there were no anachronistic elements in the paper used for the Paintings, but disagreed regarding the inks. It was not clear error to find this and the other evidence presented at trial in equipoise.

The Boulés contend that the burden of proof regarding the origin of the Paintings should have been placed on the defendants. Under the Lanham Act, the burden of proving that a statement made by a defendant is false generally rests on the plaintiff. *See, e.g., S.C. Johnson & Son, Inc.,* 241 F.3d at 238.

The Boulés contend that Hutton and the Khidekels implied that they had conducted tests on the Paintings, and as a consequence, that the Boulés need only show that no tests were done. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992). The Boulés also contend that the burden of proof should have been shifted to the defendants both because the defendants were in a better position to disprove the authenticity of the Paintings, and because it is difficult to prove that the Paintings are authentic. As these arguments were not presented to the district court, they need not be addressed here unless it would be necessary to avoid a manifest injustice. *See Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133 (2d Cir.2001). We find no manifest injustice in refusing to entertain these arguments. We need not decide today, therefore, whether statements about facts uniquely within the ability of defendants to know or prove would justify an alteration in the burden of proof.

ii. State law claims

■ The Boulés appeal from the denial at trial of their claims under Section 349 of New York's General Business Law and the New York common law of unfair competition by disparagement. The district court denied these claims based on its conclusion that the plaintiffs had failed to carry their burden to show that the Paintings were authentic. While most of the state law claims were based on statements about the authenticity of the Paintings, some were not. The *Le Devoir* and *ARTnews* statements addressed the certificates that Mark had provided to the Boulés and the conversations between the Boulés and Khidekels about the Paintings. As the district court held that plaintiffs proved by a preponderance of the evidence the falsity of the statements in *Le Devoir* and *ARTnews, Boulé,* 138 F.Supp.2d at 505, we remand for further proceedings to determine whether these false statements constitute a violation of Section 349 and the claim of unfair competition by disparagement. In addition, because Section 349 requires proof of a deceptive practice, and does not require proof that a statement is false, we remand for further proceedings on all of plaintiffs' claims under Section 349.

■ A few additional observations about these two causes of action may prove of assistance on remand. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law. § 349(a). To establish a claim under Section 349, the plaintiff must show "a materi-

al deceptive act or practice directed to consumers that caused actual harm." *Marcus v. AT & T Corp.*, 138 F.3d 46, 63 (2d Cir.1998); *see also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir.1994); *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 323–24, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002). We have not yet decided whether false statements are likely to be deceptive. *See Ortho Pharm.*, 32 F.3d at 697. "Deceptive acts" are defined objectively, as acts "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir.2000). Further, a deceptive practice "need not reach the level of common-law fraud to be actionable under section 349." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000).

■ The district court expressed reservations as to whether plaintiffs are within the class of persons, namely, consumers, for whose protection Section 349 was enacted. *Boulé*, 138 F.Supp.2d at 501 n. 7. Section 349, however, allows recovery not only by consumers, but also by competitors if there is "some harm to the public at large." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995). Although a Section 349 plaintiff

is not required to show justifiable reliance by consumers, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995), "[a]n act is deceptive within the meaning of the New York statute only if it is likely to mislead a reasonable consumer." *Marcus*, 138 F.3d at 64.

■ On appeal, the Boulés describe their claim of "unfair competition by disparagement" as a claim for defamation of another's business.[8] Where a statement impugns "the basic integrity" of a business, an action for defamation *per se* lies, and general damages are presumed. *See Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981); *see also Fashion Boutique*, 314 F.3d at 59 (2d Cir.2002); *Chiavarelli v. Williams*, 256 A.D.2d 111, 681 N.Y.S.2d 276, 277 (1st Dep't 1998). Nonetheless, actual damages must be proved with competent evidence of the injury. *Fashion Boutique*, 314 F.3d at 59.[9]

iii. Damages

Plaintiffs have also challenged the award of only nominal damages for the defamation claim on which they prevailed at trial, as well as the measure of damages for the successful breach of contract claim. As

---

**8.** In the Revised Joint Pretrial Order the Boulés described their claim for unfair competition by disparagement broadly to encompass both product disparagement and disparagement of their business. On appeal, they press only the claim for defamation of their business presumably because of the difference in the standard for an award of damages. A claim for defamation of another's business is distinct from a claim for product disparagement. Among other things, special damages must be proven for a product disparagement claim. *See Fashion Boutique*, 314 F.3d at 59. An early case notes that statements disparaging another's product were called "trade libel," another's business called "injurious falsehood," and another's title called "slander of

title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 (1st Dep't 1965).

**9.** The Khidekels argue that the plaintiffs must satisfy all the requirements of a Lanham Act claim to prevail on a claim of unfair competition by disparagement of a business. The case on which the Khidekels rely, *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir.1997), however, involves a state law claim of unfair competition, which is akin to trademark infringement, and not claims of disparagement, which are more akin to defamation claims.

both of these awards were based on findings of fact that are not clearly erroneous, they are affirmed.

## C. *Rule 60(b) Motion*

■ A district court's decision to deny a motion pursuant to Rule 60(b), Fed. R.Civ.P., is reviewed for abuse of discretion. Rule 60(b)(2) provides relief when the movant presents newly discovered evidence that could not have been discovered earlier and that is relevant to the merits of the litigation. *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir.1993) (per curiam). As we find that the district court acted well within its discretion in finding that the evidence proffered by plaintiffs in support of this motion could have been discovered in time to move for a new trial, and would not in any event have changed the decision at trial, the denial of the Rule 60(b)(2) motion is affirmed.

We have considered the appellants' remaining claims and find them without merit.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED in part and VACATED and REMANDED in part. We AFFIRM the district court's rulings on summary judgment. We AFFIRM the decision at trial, except for the dismissal of the claims brought under Section 349 of the New York General Business Law and except for the dismissal of two claims under the New York common law for unfair competition by disparagement, which are VACATED and REMANDED for further proceedings consistent with this opinion. The district court's ruling on plaintiffs' Rule 60(b)(2) motion is AFFIRMED.

CALABRESI, Circuit Judge, concurring.

I write a few words separately to explain my understanding of the opinion and why I am quite comfortable joining it in full. Like an earlier panel of our court, we state that the definition of "commercial advertising or promotion" in the Lanham Act is the same as the definition of "commercial speech" for purposes of First Amendment analysis. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir.2002); *see also Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994). It goes without saying (and therefore probably deserves being said) that this definition simply means that Congress did not wish to extend federal Lanham Act liability to speech that is subject to broader general First Amendment protection than is commercial speech. Such noncommercial speech, however, may well remain the grounds of recovery under state laws. In other words, as the opinion notes, even noncommercial speech may, in appropriate cases, be actionable. *See ante* at 92 n. 7. Today's holding means only that Congress chose not to make that kind of speech federally actionable under the Lanham Act. It is for these reasons that the opinion is able to remand the speech here discussed for consideration of whether it (a) violates section 349 of New York's General Business Law or (b) may be the basis for recovery under the New York common law of unfair competition by disparagement.

I also note that the Supreme Court currently has before it a case which, though not arising under the Lanham Act, raises questions as to the definition of "commercial speech" for First Amendment purposes. *Nike, Inc. v. Kasky*, —— U.S. ——, 123 S.Ct. 817, 154 L.Ed.2d 767 (2003) (memorandum opinion granting certiorari). Because the instant case is being remanded, we have deemed it appropriate not to wait for that decision. But it should be

clear that should the Supreme Court's ruling in *Nike* cast doubt on our holding that the statements to *ARTnews* and to other publications constituted noncommercial speech, the district court is free to reconsider our decision in light of that Supreme Court holding.

With these caveats, I concur both in the result and in the opinion of the court.