**René BOULÉ and Claude Boulé, Plaintiffs,**

v.

**Ingrid HUTTON, Leonard Hutton Galleries, Inc., Mark Khidekel and Regina Khidekel, Defendants.**

No. 97 Civ. 144(MGC).

United States District Court, S.D. New York.

June 1, 2004.

Katten Muchin Zavis Rosenman, New York, New York, By: Gerald A. Rosenberg, Stacey B. Creem, Ellen B. Unger, for Plaintiffs.

Sonnenschein Nath & Rosenthal LLP, New York, New York, By: Martin R. Gold, for Defendants Ingrid Hutton and the Leonard Hutton Galleries, Inc.

Anastasios Sarikas, Astoria, New York, By: Anastasios Sarikas, for Defendants Mark and Regina Khidekel.

## OPINION

CEDARBAUM, District Judge.

The parties to this action dispute whether plaintiffs Claude and René Boulé have proved the elements of their claims under N.Y. Gen. Bus. L. § 349 and their claims of common law unfair competition by business disparagement. These claims were dismissed after a bench trial, *see Boulé v. Hutton*, 138 F.Supp.2d 491 (S.D.N.Y.2001), but remanded by the Second Circuit for further consideration, *see Boulé v. Hutton*, 328 F.3d 84 (2d Cir.2003). For the following reasons, plaintiffs have failed to prove their § 349 claims but have proven all of the elements of their claims of business disparagement.

## BACKGROUND

Plaintiffs are Parisian art collectors who own a number of works attributed to Lazar Khidekel, a Russian artist associated with the Suprematist Movement. Claude Boulé is also an art historian specializing in Russian Constructivism, which, like Suprematism, is a branch of Russian Futurism. The Boulés filed this action against Mark and Regina Khidekel, a son and daughter-in-law of Lazar Khidekel, and against Ingrid Hutton and the Leonard Hutton Galleries, Inc. ("Hutton Galleries"), the art dealer and art gallery that exhibited and offered for sale a collection of Khidekel works that Mark and Regina inherited from the artist. The Boulés sued under the Lanham Act, 15 U.S.C. § 1125(a), claiming that defendants falsely disparaged the authenticity of the Boulés' collection in order to promote the sale of

the Khidekel artworks at the Hutton Galleries. The Boulés also asserted pendent state law claims, including violations of N.Y. Gen. Bus. L. § 349, breach of contract, product disparagement, defamation, tortious interference with business relationships, common law unfair competition, unjust enrichment, common law fraud, prima facie tort, and the tort of "false light." After partial summary judgment was granted in favor of defendants on all but one of the Lanham Act claims, *see Boulé v. Hutton et al.*, 70 F.Supp.2d 378 (S.D.N.Y. 1999), a bench trial was held from September 27 through October 6, 2000.

The following evidence, relevant to the remanded claims, was presented during the trial. The Boulés paid approximately 1.5 million French Francs ("FF") for 176 works on paper attributed to Khidekel. They bought the works over a four-year period, beginning in 1984, from a private dealer named Vladmir Tsarenkov. Tsarenkov did not provide the provenance of any of the works that he sold to the Boulés. In 1991, the Boulés also purchased an oil painting attributed to Khidekel from an auction in England.

The Boulés were introduced to Mark Khidekel in 1988 at their home in Paris. They showed Mark some of the Khidekels in their collection, and he expressed no skepticism about the authenticity of the works. The Boulés and the Khidekels subsequently met several times at the Boulés' home, and the Khidekels never expressed any reservations about the Boulé collection. During a meeting in 1991, Mark agreed to sign certificates of authenticity for 16 of the Boulés' Khidekels, for 2,500 FF per certificate.

Plaintiffs presented evidence that defendants later made several statements disparaging the Boulés' collection of Khidekels. A curator, Yvette Moch, testified that in October 1994, she approached Hutton in order to show her the catalogue of an exhibition in Tanlay, France, which had featured Khidekels from the Boulé collection. Upon seeing reproductions of those works in the catalogue, Hutton commented, "that is no good."

Upon visiting Hutton in late 1995 in order to borrow works for a proposed art exhibition at the University of Iowa, another curator, Patricia Railing, was told by Hutton that she would only lend works to the exhibition if she could first see the complete list of works to be included. Hutton stated that she did not "want [her] works contaminated with fakes in an exhibition in which there are fakes." Railing understood Hutton to be commenting on the authenticity of the Boulé collection. The Khidekels later informed Railing that the Boulé collection was "not by my father, they're fakes."

In the catalogue for the Hutton Galleries' February and March 1995 show of Khidekels owned by Mark and Regina, Hutton wrote: "We present for the first time anywhere the work of Lazar Markovich Khidekel.... In his lifetime [Lazar Khidekel] never had a solo show, nor did he or his family ever sell or part with any of his works."

In January 1996, Mark, Regina, and Hutton sent a letter on the letterhead of the Hutton Galleries to at least twenty-five museums worldwide. The letter informed its recipients that the writers repudiated the catalogue of an exhibition of Boulé Khidekels held at the Musée d'art de Joliette, Quebec, Canada in 1992, and that the writers would not permit those works to be cited in connection with any works by Khidekel coming from the Khidekel family or from the Hutton Galleries.

In its February 1996 issue, *ARTnews* published a 13–page article entitled, "The Betrayal of the Russian Avant Garde."

The article reported on the prevalence of incorrectly attributed works and forgeries in Russian avant-garde art and discussed works by several artists, including Khidekel. Regina was quoted in the article as follows:

> When [Mark and Regina] finally saw the works, which belong to Paris collectors Claude and René Boulé, they were ... puzzled. "I don't know whether they're fakes or works of somebody else," says Regina. "I only know and we are absolutely sure, that they have nothing to do with Khidekel."

In a February 23, 1996 article in the Montreal publication *Le Devoir*, Regina is quoted as saying, "I am categorical: these works are not by Khidekel." In the February 22–28, 1996 issue of the Montreal periodical *Voir*, Mark and Regina are quoted as saying that the works in the Boulés' collection are "not those of Khidekel." The *Voir* article also republished one of Regina's statements in the *ARTnews* article.

Mark and Regina also made statements in which they denied that they had initially endorsed the Boulé Khidekels. In the *ARTnews* article, Mark and Regina are quoted as saying that upon seeing the Boulé collection at the Boulés' Paris home for the first time, "they told the Boulés the works were not Khidekels." In the February 23, 1996 *Le Devoir* article, Regina is quoted as saying that "neither she nor her husband ever 'authenticated' anything and that fake certificates were forged."

The majority of plaintiffs' claims required them to prove the falsity of defendants' statements. But plaintiffs were unable to establish by a preponderance of the evidence that the Khidekels in their collection were authentic. Accordingly, they could not prove that defendants' statements that impugned the authenticity of the collection were false. *See Boulé*, 138 F.Supp.2d at 503–04. However, plaintiffs did prove both that the Khidekels expressed no skepticism upon first viewing the Boulé collection and that Mark Khidekel had signed the sixteen certificates of authenticity. Accordingly, plaintiffs proved that the Khidekels' statements to the contrary were false.

Judgment was entered in favor of plaintiffs on their claim of breach of contract, which was premised on the agreement by which Mark provided the certificates of authenticity, and on two of their claims of libel per se. Because they could not prove the authenticity of their collection, the Boulés recovered only restitution damages for the former claim; because they could not prove actual damage to Claude Boulé's reputation as an art historian, they recovered only nominal damages for the latter claims. *See id.* at 508. The remainder of plaintiffs' claims were dismissed.

On appeal, the Second Circuit affirmed the majority of the factual findings and legal conclusions. The Court remanded plaintiffs' claims under N.Y. Gen. Bus. L. § 349, noting that because § 349 requires proof of a deceptive practice, not necessarily a false statement, all of defendants' statements must be analyzed under § 349. *Boulé*, 328 F.3d at 93. The Court also remanded plaintiffs' disparagement claims that were based on statements found to be false. *See id.* The Court noted that while the Boulés had pleaded unfair competition by product disparagement and by disparagement of their business, they characterized this claim on appeal as one of "defamation of another's business." *Id.* at 94 & n. 8.

## DISCUSSION

I. *Plaintiffs' Claims under N.Y. Gen. Bus. L. § 349*

■ To prevail on a § 349 claim, a plaintiff must show that "(1) the defen-

dant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir.2000) (per curiam).

■ A representation or act is deceptive within the meaning of § 349 if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). Plaintiffs need not show that defendants intended to defraud or mislead consumers. *See id.*

■ Although § 349 is primarily a consumer protection statute, courts have determined that "corporate competitors now have standing to bring a claim under this [statute] ... so long as some harm to the public at large is at issue," *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995) (quoting *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 786 F.Supp. 182, 215 (E.D.N.Y.), *vacated in part on other grounds*, 973 F.2d 1033 (2d Cir.1992)). Specifically, plaintiffs suing as competitors under § 349 must show that the defendant's allegedly deceptive practice "affects the public interest in New York." *Id. See also Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988) ("the gravamen of the complaint must be consumer injury or harm to the public interest").

■ The Boulés contend that defendants' statements caused two types of public harm in New York. First, defendants deceived consumers into believing that authentic Khidekels were available only from the Hutton Galleries and from Khidekel's heirs. Second, defendants' statements deprived the public of the opportunity to purchase, study, view, and appreciate the Boulé Khidekels.

Even assuming that the Boulés can satisfy all of the other elements of their claims under § 349, they cannot succeed because they have not shown harm to the public interest in New York. The first type of public harm they articulate is purely speculative. Plaintiffs failed to offer evidence at trial that showed that consumers, in New York or elsewhere, were interested in purchasing art by Khidekel. The evidence showed that a 1995 Hutton Galleries exhibition of several dozen Khidekels from Mark and Regina's collection resulted in only four sales, two of which were pieces not on display. The Boulés consigned four of their Khidekels to a Parisian gallery owner, Edith Flak, for display at the April 1995 Art Messe in Frankfurt, but none of those works were sold. Furthermore, plaintiffs did not present evidence that New York consumers had any access to the Boulé Khidekels, so it is unclear how deceptive statements about plaintiffs' collection would have affected New York consumers in any way. While the Boulés loaned Khidekels from their collection to museums, they did so only in Europe and Canada. Their attempts to sell pieces from the collection occurred only in Europe.

Plaintiffs also failed to show *how* New York consumers were injured. Plaintiffs did not present evidence that the New York purchasers of Khidekels from the Hutton Galleries paid a premium for the artworks because of a false belief in the rarity of authentic Khidekels. And if the claim is simply that defendants lied to consumers, it is difficult to see how such lies injure consumers if the consumers do not act on the lies.

■ Plaintiffs' second claimed consumer injury—that the public was deprived of the ability to purchase, study, view, and appre-

ciate the Boulé Khidekels—is also flawed. First, it is not clear whether this type of harm is cognizable under § 349. Courts generally find that competitors state a claim under § 349 only when they allege some harm to the public health or safety. *See, e.g., Securitron*, 65 F.3d at 264–65 (holding that the plaintiff had adequately shown harm to the public interest, in part because defendants "gave false information . . . [to] a regulatory agency primarily concerned with the safety of the public"); *Sports Traveler, Inc. v. Advance Magazine Publishers*, No. 96 Civ. 5150(JFK), 1997 WL 137443, at *2 (S.D.N.Y. Mar.24, 1997) ("[F]ederal courts have interpreted the statute's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety."). A claim that consumers have been denied the ability to appreciate art is not such a claim.

Even if this aesthetic injury is an appropriate ground for relief under § 349, plaintiffs have not proved it. In addition to the lack of proof of New York interest in Khidekel or New York access to the Boulé collection, plaintiffs failed to show that their collection of Khidekels is authentic. There can be no injury to those who have been deprived of the ability to purchase, study, or enjoy certain works of art where it has not been established that those artworks are authentic.

Furthermore, several of defendants' statements could not have had any impact on New York consumers. Several were published in French in Canadian periodicals. Moch and Railing were not affiliated with museums or galleries in New York. Plaintiffs do not persuasively explain how these statements could have affected the public interest in New York.

The evidence at trial showed that New York consumers had little or no interest in purchasing Khidekels and no access to Khidekels other than those offered by the Hutton Galleries. The evidence did not show how defendants' deceptive statements could have caused consumer injury. Accordingly, plaintiffs have not shown that defendants' statements injured the public interest in New York by misleading consumers as to reliable sources for authentic Khidekels or by denying consumers the ability to appreciate and purchase the Boulé Khidekels.

## II. *Plaintiffs' Disparagement Claims*

In remanding these claims for further consideration, the Second Circuit noted that "[w]here a statement impugns 'the basic integrity' of a business, an action for defamation *per se* lies, and general damages are presumed. Nonetheless, actual damages must be proved with competent evidence of injury." *See Boulé*, 328 F.3d at 94 (citations omitted) (citing *Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981)). *See also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir.2002). Only defendants' statements that were found to be false were remanded for further consideration. *Boulé*, 328 F.3d at 93.

The questions remaining on remand are whether the Boulés' art collection can be considered a "business" for the purpose of these claims, whether these statements impugned the integrity of that business, and whether the Boulés proved actual damages.

■ With respect to the first question, defendants argue that the collection is not a business, but they cite no case that defines "business" in the context of a claim of unfair competition by business disparagement. In assessing plaintiffs' Lanham Act

claims upon defendants' motion for summary judgment, I held that plaintiffs had standing to sue under the Act as "commercial parties," because they showed "more than a mere economic interest in what they own.... In the context of the art market, where plaintiffs own a significant percentage of the extant works attributed to one artist, where plaintiffs have taken steps to promote their collection, and where plaintiffs contracted to sell a substantial number of those works, plaintiffs have a sufficient commercial interest at stake to give them standing to sue under section 43(a) of the Lanham Act." *Boulé,* 70 F.Supp.2d at 386. Evidence at trial confirmed that the Boulés exhibited their collection widely and made plans with Edith Flak to create a market for Khidekels in Paris by consigning to her a significant number of works. Defendants have offered no reason why plaintiffs' art collection should not be considered a business under the common law of unfair competition by disparagement.

■ It is clear that these statements impugned the integrity of the Boulés' art collection and the reputation of the Boulés as sellers of art. Indeed, these statements can be seen as more harmful to the Boulés in the business context than the statements averring that the Khidekels in their collection were fake. The latter claim suggests only that the Boulés may have erroneously purchased works of art which they believed were by Khidekel. But defendants' false statements to the effect that the Boulés possessed and relied upon forged certificates of authenticity, and that they persisted in displaying and seeking to sell artworks which they had been informed were fakes by the individual who had signed those certificates, impute far more sinister motives to the Boulés. They suggest that the Boulés sought to deliberately deceive prospective purchasers of their collection by supporting the uncertain provenance of the works with certificates of authenticity they knew to be forgeries. In the business disparagement context, an insinuation of conscious or willful wrongdoing would be far more damaging to the reputation or integrity of the Boulé collection than a suggestion that the Boules may simply have been mistaken about the provenance of some of their pieces.

■ The final issue is whether plaintiffs have offered evidence of actual damage. Because defendants' defamatory statements appeared in articles that also contained injurious but nonactionable allegations by defendants to the effect that the Boulé Khidekels were fake, it is difficult to gauge the full extent of the damage done by the defamatory statements. The Boulés attempt to cure this deficiency by submitting additional evidence of their damages. However, the new affidavits the Boulés offer involve allegedly defamatory statements made by defendants that were not raised at trial, as well as information intended to overturn findings of fact that were not challenged on appeal. Plaintiffs have offered no persuasive justification for reopening the evidence to admit this new information.

Although the damage to the reputation of the entire Boulé collection is not susceptible to precise calculation, it is clear that these statements destroyed the value of the sixteen drawings for which Mark Khidekel provided certificates of authenticity. While they likely contributed to the diminution of value of the remainder of the Khidekels in the Boulé collection, any attempt to gauge that damage would be too speculative.

■ The next question is how to assess the value of those sixteen drawings. Plaintiffs have not offered credible evidence of the market value of their Khidek-

el collection, both because they failed to establish that a market for Khidekel drawings exists, and because they failed to prove that these artworks were, in fact, authentic Khidekels. However, they did offer competent evidence of how much they paid for the entirety of their collection of 176 Khidekel drawings: approximately 1.5 million FF, which equaled $201,177.66 at the prevailing rate of exchange in 1996, when the defamatory statements were made. The average cost of each drawing would therefore have been $1,143. The cost of the sixteen drawings for which certificates of authenticity were provided would, by this analysis, be $18,288.88. This is a reasonable assessment of the least amount of damages plaintiffs suffered from defendants' disparagement of their business.

█ Plaintiffs argue that they are entitled to prejudgment interest. N.Y. C.P.L.R. § 5001(a) provides that:

> Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

The New York Court of Appeals has observed that § 5001 "is phrased broadly and is designed to obliterate all distinctions that may turn on the form of the action ..., the type of property involved, or the nature of the encroachment upon the plaintiff's property interests." *DeLong Corp. v. Morrison–Knudsen Co.*, 14 N.Y.2d 346, 349, 251 N.Y.S.2d 657, 200 N.E.2d 557 (1964) (citation omitted). Other courts applying New York law "have without qualification awarded interest as a matter of right whenever any tortious conduct causes pecuniary damage to tangible or intangible property interests." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 695 (2d Cir.1983) (collecting cases). It is clear that the Khidekels' intentional, defamatory statements damaged the pecuniary value of the Boulé collection. Accordingly, plaintiffs are entitled to prejudgment interest from February 1996 at the statutory rate of 9%. *See* N.Y. C.P.L.R. § 5004.

## CONCLUSION

For the foregoing reasons, plaintiffs have failed to carry their burden of proving by a preponderance of the evidence all of the elements of their claims under N.Y. Gen. Bus. L. § 349. But, plaintiffs have succeeded on one claim of unfair competition by disparagement against Mark and Regina Khidekel and one claim of unfair competition by disparagement against Regina Khidekel. For these claims, damages of $18,288.87 are awarded in favor of plaintiffs against the Khidekel defendants.

The Clerk is directed to enter a supplementary judgment for plaintiffs and against Mark and Regina Khidekel in the amount of $18,288.88 plus simple interest at the rate of 9% *per annum* from February 1996 to the date of entry of the supplementary judgment.

SO ORDERED.